**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0795n.06

Nos. 12-1496, 12-1497, 13-1211

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| THAL FLAM WENDROW; JULIAN WENDROW; THAL FLAM WENDROW, Parent and Conservator of AW and IW, minors; AW, a minor child by Thal Flam Wendrow, Parent and Conservator; I.W. a minor child by Thal Flam Wendrow, Parent and Conservator | ) ) ) ) ) ) | **FILED** Aug 28, 2013 DEBORAH S. HUNT, Clerk |
|     Plaintiffs Appellees (12-1496, 12-1497)     Plaintiffs Appellants (13-1211) | ) ) ) ) | ON APPEAL FROM THE THE UNITED STATES |
| v. | ) ) | DISTRICT COURT FOR THE EASTERN DISTRICT OF |
| MICHIGAN DEPARTMENT OF HUMAN SERVICES; REBECCA ROBYDEK | ) ) ) | MICHIGAN |
|     Defendants Appellants (12-1497) | ) ) | |
| SHERRYL BROWN; NATALIE MILLER; CYNTHIA SCARSELLA; VERONICA BURKE | ) ) ) | |
|     Defendants Appellants (12-1496) | ) ) | |
| COUNTY OF OAKLAND; DEBORAH CARLEY; ANDREA DEAN; | ) ) ) | |
|     Defendants Appellees (13-1211) | ) ) | |
| ISMAEL AHMED; ERIC OVERALL; DAVID GORCYCA; WALLED LAKE CONSOLIDATED SCHOOL DISTRICT; WILLIAM HAMILTON; | ) ) ) ) | |
|     Defendants (12-1496, 12-1497, 13-1211) | ) ) | |

**Before: MOORE and STRANCH, Circuit Judges; and HOOD, District Judge.**[*]

JOSEPH M. HOOD, District Judge. Plaintiffs Thal Flam Wendrow, Julian Wendrow, and their minor children, AW and IW, brought a civil rights complaint alleging various constitutional and state tort claims against several governmental entities and government employees following the dismissal of charges against Thal and Julian. Those charges stemmed from Julian's alleged sexual abuse of AW, who is unable to meaningfully communicate in any conventional manner as a consequence of her severe autism. This matter is before the Court on three consolidated appeals. These include the interlocutory appeals of first, Defendants Michigan Department of Human Services and Rebecca Robydek, who were involved in the investigation of AW's alleged sexual abuse, and second, Defendants Sheryl Brown, Natalie Miller, Cynthia Scarsella, and Veronica Burke, educators at AW's school who were also involved in the investigation of sexual abuse. These Defendants appeal the district court's denial of governmental and qualified immunity on summary judgment. Their interlocutory appeals were consolidated with the Plaintiffs' appeal of the district court's final order dismissing the claims against Defendants Oakland County, Deborah Carley, and Andrea Dean on absolute and qualified-immunity grounds for their actions in their respective prosecutorial roles. The district court certified as final its judgment as to the prosecutors, pursuant to Federal Rule of Civil Procedure 54(b). For the reasons that follow, we affirm in part, and reverse in part, the district court's judgment.

**I.**

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Thal and Julian Wendrow allege that their children were improperly removed from their home and that they were maliciously prosecuted following statements allegedly made by AW through a technique called "facilitated communication" ("FC"), in which AW reported sexual abuse by her father. During the course of the investigation and prosecution, Defendants' actions resulted in a number of alleged wrongs to AW and IW as well, including the detention and interrogation of IW and a gynecological exam of AW, both without a court order or notice to or approval of a parent or the minors' court-appointed guardian. The alleged wrongs occurred over the course of an investigation and prosecution that spanned several months, and they cover a gamut of activity with respect to each claim and each Plaintiff.

AW is autistic and almost entirely nonverbal. She began using FC when she enrolled in the sixth grade in the Walled Lake Consolidated School District ("WLCSD"). Although no one else in the district used FC, the Wendrows were hopeful that AW would be able to communicate using this technique.

FC was developed in the 1970s to allow individuals with certain physical or mental impairments, such as cerebral palsy, to communicate by typing. With FC, a facilitator holds or supports the individual's hand or arm to allow that person to use a keyboard, or to point at pictures, words or letters. The technique has since been widely criticized because research has repeatedly demonstrated that the facilitators, rather than the disabled individuals, have consciously or subconsciously been the authors of the communications. Sandra McClennan, Ph.D., a proponent of the use of FC and the professional who trained AW, her parents, and her facilitators, confirmed that "when one person is supporting another to communicate there is always a concern, a question about consciously or unconsciously influencing where that person's hand goes. As a facilitator I have to

3

be extremely careful and always conscious not to do that. And it can happen in very subtle ways."
[R. 201-4 at 3889 90.] As a result of facilitator influence, whether subconscious or conscious, FC has caused numerous instances of false allegations of sexual abuse. In fact, the American Academy of Child & Adolescent Psychiatry, the American Psychological Association, and the American Academy of Pediatrics have specifically warned against the use of FC to confirm or deny allegations of physical or sexual abuse.

Prior to sixth grade, an assessment revealed that AW's cognitive ability was lower than her age would suggest, and there is no evidence that she had learned to read at that time. However, AW used FC during sixth, seventh, and eighth grades and suddenly appeared to be performing at grade level, which encouraged the Wendrows. Soon after entering sixth grade, AW was placed in mainstream classes and was purportedly typing words and sentences and completing grade-level work. More likely, according to professional studies and based on a subsequent assessment finding that AW had the communication skills of a three-year old, her facilitators were consciously or subconsciously authoring her communications.

In September 2007, AW began high school using three new facilitators: Defendant Natalie Miller, AW's new teacher; Defendant Cindy Scarsella, AW's paraprofessional for her morning classes; and another paraprofessional, not named as a party, for her afternoon classes. Defendant Veronica Burke, the School District's Special Services Coordinator, arranged for Miller and Scarsella's training. It is undisputed that Miller and Scarsella received less training than AW's facilitators in middle school, and they testified that they were facilitating AW's statements in a manner that was inconsistent with their training. After starting high school, AW's statements were less coherent than in prior years.

On November 27, 2007, several months after Scarsella and Miller began working with her, AW allegedly typed, with Scarsella facilitating, that her father sexually abused her. Scarsella notified Miller, who immediately sat down with AW and facilitated similar statements. After conferring with Defendant Sheryl Brown, the Director of Special Services at WLCSD, Miller reported the allegations to the Children's Protective Services program of the Michigan Department of Human Services ("DHS").

Once the initial report was made, DHS, the West Bloomfield Police Department, and the Oakland County Prosecutors Office all became involved in an investigation. AW and her brother, IW, were removed from their home and placed in the home of their grandmother, and later with a local Rabbi. AW was interviewed about her allegations at the CARE House, an Oakland County program that specializes in forensic interviews of child victims of sexual abuse.

Prior to AW's interview at the CARE House, AW's family members made numerous attempts to speak with Defendant Rebecca Robydek, the social worker assigned to AW's case, about the proper FC protocols for authenticating these allegations. These protocols included using a facilitator who was unaware of the allegations or using a facilitator who could not hear the questions being asked to assure that AW was authoring her own statements. Robydek, who did not have any training regarding children with disabilities, did not return any of the family members' phone calls, look into the use of naïve facilitators, or investigate whether authentication protocols were being used.

Dr. McClennan and the family members also tried to reach out to Dr. Burke and others involved in the investigation to educate them about the proper protocols for verification of sexual-abuse allegations. Dr. McClennan tried to contact the CARE House in advance of the victim

5

interview to offer her services to assist with AW's communication needs and to assist with the investigators' understanding of FC. Later, Dr. McClennan also spoke with AW's court-appointed guardian ad litem and again emphasized the importance of using appropriate protocols. However, a naïve facilitator was never contacted. Despite numerous admonitions, Miller and Scarsella were the only two facilitators used throughout the investigation.

AW was interviewed at the CARE House on November 29, 2007. AW's purported statement, through Scarsella, was that her father had raped her since the age of six and that her mother knew but did nothing. AW also purportedly accused her brother, IW, of participating in the abuse. Robydek, Burke, Scarsella, and representatives from law enforcement agencies were present at the interview. Contrary to Michigan's Forensic Interviewing Protocol, which Robydek and others were required to follow, the interview neither involved the professional who had the most contact with the child or the development of her communication system (Dr. McClennan) nor an independent specialist who could evaluate AW's needs.

Plaintiffs contend that certain events and factual errors in AW's statement during the interview should have raised the interviewers' suspicions that AW was not the author of her statements. AW indicated, using a yes/no sticker on the keyboard, that she could help set up the computer and would do so, but it became evident that she was not going to follow through, even though she did not exhibit difficulty using her fingers and hands. Plaintiffs contend that this should have provided evidence for the interviewers to investigate whether AW was meaningfully communicating. The interviewers and others present realized that AW misspelled her father and brother's names, that she misidentified family members, including her grandmother, and that she created family members during the interview. Later in the investigation, they realized that AW had

6

not provided the correct name for the family dog. After the interview, the police executed a search warrant at the Wendrows' home and found that the rooms were not as AW described in her statements. Also, during the search, they did not find videos or pictures of AW naked, as she had reported during the interview. In fact, the search did not reveal any evidence of a crime. Incongruously, AW's statement indicated that when she was six years old AW typed a message to her mother to tell her that Julian was abusing her, but AW did not use FC or type at the age of six. Law enforcement personnel recognized some of the mistakes, but there was no change in the course of the investigation. Despite the lack of any corroborating evidence, the prosecuting attorney issued charges against Julian Wendrow.

After the CARE House interview, Robydek decided to take both AW and IW into protective custody based solely on the facilitated interview with AW. A court order was entered on November 29, 2007. Although Robydek did not seek or obtain a court order for authorization for medical treatment, Robydek also took AW for a gynecological examination to obtain evidence of sexual abuse shortly after she was taken into protective custody. Robydek did not notify or obtain permission from the Wendrows or the court-appointed guardian ad litem before doing so. The nurse conducting the exam, Diane Zalecki, R.N., observed three small tears in AW's hymen. The tears, Nurse Zalecki testified, could result from a number of causes, and did not occur during the time period that the investigators were initially concerned about, specifically the 96 hours preceding the exam. Nurse Zalecki further testified that she told several prosecutors, during several conversations, that she could not say that the exam was indicative of sexual assault, and that she would testify consistently with that conclusion.

Also, on November 29, 2007, Robydek transported AW's thirteen-year-old brother, IW, to the police station for an interview. He was interrogated for four hours. Throughout IW's interviews by various personnel during the investigation, he continued to deny that the abuse described in AW's facilitated statements occurred. However, he did describe Julian assisting AW in the shower while Julian was sometimes naked, which Defendants contend was sufficient to support the abuse allegation. Prosecutors Dean and Carley also argue that IW's testimony that Julian played or told a joke which involved exposing Julian's penis to IW further supported the abuse allegations.

On December 5, 2007, AW purportedly typed, in a statement facilitated by Scarsella, that her parents had contact with her and that they planned to flee on December 9 to South Africa. The Sheriff's Department officer assigned to AW's school and Robydek then questioned AW at school, again using Scarsella and Miller to facilitate rather than a naïve facilitator. During this interview, AW "reported" that her parents had visited her at her foster placement with Rabbi Shemtov and his wife. Her facilitated communication indicated that Rabbi Shemtov picked up Thal and Julian and brought them to his home at 3 a.m., along with at least one aunt from South Africa. Once back at the house, according to the facilitated communication, the Wendrows told everyone there that they were planning on leaving the country with AW.

Plaintiffs allege the deputy sheriff, Robydek, and Miller "cleaned up" AW's facilitated statement when they noticed inaccuracies in this report. For example, AW facilitated that "Bossy" was AW's sister, though she did not have a sister. AW was told "no," and either the deputy sheriff, Robydek or Miller deleted it from the computer. They tried again, at Miller's direction, and Miller facilitated that "Bossy" is Julian's sister, which is what appears in AW's statement that was provided to the police. No one questioned AW's authorship or indicated that the statement was corrected.

8

Julian and Thal were arrested on December 5, 2007. Thal was jailed, then released on an electronic tether; Julian remained in jail for eighty days. After interviewing those allegedly present at the 3:00 a.m. meeting, all of whom denied the events described, the police found no evidence supporting AW's account.

Throughout the relevant time period, Defendant Deborah Carley was the Chief Deputy Prosecutor. She was responsible for overseeing litigation that was handled on a day-to-day basis by other attorneys. Defendant Andrea Dean, the Assistant Prosecuting Attorney, was assigned to the case on December 6, 2007. Dean had no experience with FC prior to this case. She was involved with the case for approximately six weeks.

Prior to a preliminary examination in state court, the Wendrows challenged the reliability of FC by motion. Before that hearing, the prosecutors and the police investigators interviewed IW and AW several times. Dean also contacted numerous potential expert witnesses and conducted her own research into FC. At the hearing, following testimony by Dr. Howard Shane, the defense's expert, as well as Dr. McClennan, the prosecutors' witness, the court permitted a test where AW was asked simple questions with her facilitators, Miller and Scarsella, out of the room. Miller and Scarsella then came in to facilitate. AW mostly typed gibberish, failing to correctly answer a single question. Consequently, the court ruled that for AW to testify in court, her facilitators would not be allowed to hear the questions. Shortly after the hearing, Dean was replaced with another prosecuting attorney by Carley, her supervisor, because Carley was unhappy that Dean had called Dr. McClennan as a witness.

Over the next few weeks, the prosecutors met several times with AW to attempt to communicate. They found, however, that they did not get an appropriate response from AW when

9

the facilitator did not hear the question. They also attempted to communicate with her by having her point to yes/no cards, but were unsuccessful. The prosecutors ultimately dropped the charges because AW was unable to testify.

Julian was released from custody on February 22, 2008. The prosecutors moved to dismiss the case on March 10, 2008. The motion was granted on March 11, and AW and IW were returned to their parents on March 12, 2008.

WLCSD has stopped using FC with AW, and the district removed her from general-education classes because her teachers did not think she would benefit. Testing in 2008 revealed that AW has a cognitive age equivalent of three years in the areas of communication, daily-living skills, socialization, and motor skills. This is in contrast to previous school testing of AW, which found her to be reading at an eighth-grade level with the help of a facilitator.

In 2008, the Wendrows initiated litigation in Michigan state court against the law-enforcement personnel, prosecutors, social workers, school personnel, and government entities involved in the sexual-abuse investigation and prosecution. The sixty-one count complaint included, among other claims, federal constitutional claims filed pursuant to 42 U.S.C. § 1983, Michigan state constitutional claims, and a variety of state tort claims, including defamation, intentional infliction of emotional distress, invasion of privacy, false arrest, malicious prosecution, false imprisonment, battery, and gross negligence. Subsequently, the case was removed to federal court, and the claims against the law-enforcement defendants were dismissed pursuant to a stipulated order. Following discovery, the prosecutors, social workers, and school district personnel each moved for summary judgment.

10

In March 2011, the district court entered an order granting in part and denying in part Defendants' motions for summary judgment. Before us are two interlocutory appeals brought by the school-district defendants and the social-worker defendants, who challenge the district court's denial of qualified immunity regarding several federal constitutional claims and its denial of state-law governmental immunity on the tort claims.

Additionally, the district court dismissed all claims against prosecutors Dean and Carley. The district court found that Dean and Carley were entitled to absolute prosecutorial immunity regarding the Wendrows' § 1983 claims, and that they were entitled to governmental immunity under Michigan law regarding the state intentional tort claims. The district court certified the judgment in favor of Dean and Carley and in favor of Oakland County on the Wendrows' § 1983 municipal-liability claim as final under Rule 54(b). The Wendrows appealed the district court's judgment as to Dean and Carley on the state constitutional claim, several of the federal constitutional claims, and on the intentional tort claims. Plaintiffs have not appealed the dismissal of the claims against Oakland County.

## II.

The school-district and social-worker defendants each appeal the denial of qualified immunity as to the § 1983 claims and the denial of governmental immunity as to the state-law intentional tort claims. A denial of summary judgment on the issue of qualified immunity is immediately appealable "only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998); *see also Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 213 (6th Cir. 2011). Because our appellate jurisdiction over

11

the denial of qualified immunity on the Wendrows' § 1983 claims is limited to the question of whether "a given set of facts violates clearly established law, . . . if the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009) (internal quotation marks omitted). "Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Berryman*, 150 F.3d at 564 65. "We review the denial of summary judgment on grounds of qualified immunity de novo because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996).

We also have jurisdiction to review the district court's denial of governmental immunity under Michigan law on the Wendrows' state-law intentional tort claims. *See Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 08 (6th Cir. 2007) ("[W]e have held repeatedly that, because the denial of governmental immunity is now a 'final order' providing defendants with an appeal of right to the Michigan Court of Appeals, this court has jurisdiction over interlocutory appeals concerning pendent state law claims of governmental immunity.").

The district court entered judgment in favor of Dean and Carley on all of the Wendrows' claims, and certified the judgment as final pursuant to Federal Rule of Civil Procedure 54(b) [R. 338]. In general, "when a district court grants summary judgment on some but not all claims, the decision is not a final order for appellate purposes. However, under Federal Rule of Civil Procedure 54(b), the district court may certify a partial grant of summary judgment for immediate appeal 'if the court expressly determines that there is no just reason for delay.'" *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 500 (6th Cir. 2012) (quoting Fed. R. Civ. P. 54(b)). Because

12

"certification under Rule 54(b) was proper in this case, . . . we have jurisdiction to entertain the appeal" of the Wendrows regarding the district court's grant of absolute prosecutorial immunity to Dean and Carley on their federal claims and its grant of governmental immunity to Dean and Carley on the state-law intentional tort claims. *Id.* at 503. The Wendrows' appeal has been consolidated with the interlocutory appeals of the school-district defendants and the social-worker defendants. We review the district court's grant of summary judgment in favor of Dean and Carley de novo. *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 486 87 (6th Cir. 2006).

## III.

**A.** **Immunity for Michigan Constitutional claims against individual municipal employees Dean and Carley.**

Plaintiffs summarily argue on appeal that immunity is not a defense to a tort claim under the Michigan Constitution. However, Michigan courts have held that immunity applies for claims against municipalities and individual defendants for violations of the Michigan Constitution. *See Jones v. Powell*, 612 N.W.2d 423, 426 27 (Mich. 2000). Accordingly, the district court did not err as a matter of law when it concluded that Dean and Carley could be and were immune in their individual capacities on claims for violations of the Michigan Constitution, and the dismissal of those claims by the district court is affirmed.

**B.** **Immunity for Michigan Constitutional claims against the Department of Human Services.**

On appeal, DHS argues that Plaintiffs' claims for state constitutional torts fail as a matter of law and, therefore, Plaintiffs have not presented viable claims that avoid the state's immunity. DHS's argument ignores the distinction between the question of whether it may have immunity for a constitutional-tort claim and whether Michigan law recognizes a damages remedy for the alleged

13

violations; it collapses these issues into one inquiry. However, this panel only has interlocutory jurisdiction over the former. "In a diversity case or a federal question action involving pendent state claims, we must look to state immunity law to determine whether a denial of immunity based on state law is appealable." *Livermore*, 476 F.3d at 407. Although the district court's order as to some of Plaintiffs' claims turned on governmental immunity, only those portions of the order based on governmental immunity are appealable under Michigan law. *See* Mich. Ct. Rule § 7.203(A)(1) (stating that "[a]n appeal from an order described in MCR 7.202(6)(a)(iii) (v) [including orders based on governmental immunity] is limited to the portion of the order with respect to which there is an appeal of right"). Plaintiffs have articulated claims against DHS for which the state is not immune, and, accordingly, the district court's denial of summary judgment for DHS is affirmed.

Governmental immunity is not available "where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution." *Smith v. Dep't of Pub. Health*, 410 N.W.2d 749, 751 (Mich. 1987), *aff'd sub nom. Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989). Because of the same "custom or policy" requirement, the state's liability has been described as "limited to those cases in which the state's liability would, but for the Eleventh Amendment, render it liable under the 42 U.S.C. § 1983 standard for [federal constitutional claims against] local governments articulated in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)." *Smith*, 410 N.W.2d at 794 (Boyle, J., concurring).[1]

---

[1] The only majority opinion in *Smith* is contained in a succinct memorandum opinion summarizing the holdings on which at least four justices agreed. *See Lewis v. State of Mich.*, 629 N.W.2d 868, 870 (Mich. 2001). "Justice Boyle's analysis has generally been utilized" to determine whether a claim for damages is appropriate under Michigan law. *Reid v. State of Mich.*, 609 N.W.2d 215, 219 (Mich. Ct. App. 2000).

Plaintiffs sufficiently allege a constitutional tort claim for which immunity is not available for DHS under *Smith*. The Complaint clearly alleges violations of rights conferred to AW, IW, and Thal and Julian Wendrow, separately, by virtue of state custom or policy. For example, Plaintiffs complain that DHS violated their rights to be free from unreasonable seizure and detention. While not identified as such, DHS's only argument relating to the immunity inquiry is that Plaintiffs' claim is not based on a policy or custom but, rather, on the alleged misconduct of Robydek in her application of state policy or custom. But at the same time, DHS argues that Plaintiffs' claims fail as a matter of law because "[t]he actions that form the basis for this claims are *consistent* with state policy and law." And while there is evidence that Robydek's actions were in direct contravention of established policies and procedures, there is also evidence that she believed she was acting within DHS protocols when depriving Plaintiffs of their constitutional rights. Thus, whether Robydek was acting within the established policies and procedures is a material question of fact for resolution at the trial level. Plaintiffs have sufficiently alleged a claim, at this stage of litigation, for which DHS is not immune in accordance with the requirements of *Smith*. Thus, DHS has not demonstrated that it is entitled to immunity on this issue.

DHS's remaining arguments apply to the separate, subsidiary issue of whether Michigan law will recognize a damages claim under the constitution for the alleged constitutional torts. This is, in effect, simply an argument that Plaintiffs have failed to state a claim. But a denial of a motion to dismiss for failure to state a claim is not generally a final and appealable order. Because this question does not implicate the state's immunity, it is not properly before this Court on interlocutory appeal. *See* Mich. Ct. Rule 7.203(A)(1).

Accordingly, we affirm the district court's denial of summary judgment to DHS.

15

### C.  Immunity for IW's Fourth Amendment claims against Prosecutors Dean and Carley.

The district court concluded that the interviews of IW and AW by Dean and Carley during school hours were conducted as witness interviews to allow AW to feel more comfortable and that Dean and Carley were, therefore, protected by absolute immunity with respect to their involvement in conducting those interviews.  IW argues that the district court erred because he was considered a suspect as well as a victim and witness and, thus, Dean and Carley were acting in an investigatory rather than prosecutorial role during his interview and were not entitled to absolute immunity.  Likewise, IW maintains that if he was a suspect, then his Fourth Amendment rights were violated, and qualified immunity would not be available to Dean and Carley as a matter of law.  We agree that the prosecutors were acting in a different role with respect to IW than to AW and that Dean and Carley are not entitled to absolute or qualified immunity for their interview of IW.  Accordingly, the district court's dismissal of IW's Fourth Amendment claim against Dean and Carley is reversed.

Because this analysis is subject to a "functional approach," this Court must determine the nature of the function performed to assess whether immunity is proper.  *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Forrester v. White*, 484 U.S. 219, 229 (1988)).  Dean and Carley bear the burden of demonstrating that their actions are an "'integral part of the judicial process' or . . . are 'intimately associated with the judicial process'" in order to claim absolute immunity.  *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  By contrast, only qualified immunity is available for prosecutors' actions that are "investigative or administrative in nature, because they are more removed from the judicial process."  *Id.* (internal quotation marks omitted).  "A prosecutor's administrative duties and those investigatory functions

16

that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Dean and Carley argue that they were merely interviewing witnesses as part of their preparation for trial when they met with AW and IW. In support of their position, Dean and Carley note that the interviews took place after probable cause to arrest Julian was established and in preparation for court proceedings. While Dean and Carley do not deny that they were still gathering additional facts in support of their case, they contend that gathering new information does not transform their function into that of investigation    instead, they were continuing in their roles as advocates overseeing trial preparation. *See KRL v. Moore*, 384 F.3d 1105, 1112  13 (9th Cir. 2004).

Dean and Carley's position, however, overlooks one pivotal fact    there is evidence in the record indicating that IW was considered a suspect in AW's abuse. Activities undertaken in an effort to "search[ ] for clues and corroboration that might give [the prosecutor] probable cause to recommend that a suspect be arrested" are not entitled to immunity. *Buckley*, 509 U.S. at 273; *Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999). If IW was suspected of participating in the abuse of his sister, AW, then the interview with IW on school grounds would fall within Dean and Carley's roles as investigators. Prosecutors who supervise and participate in unconstitutional police interrogations of a criminal suspect are not entitled to absolute immunity. *Joseph v. Patterson*, 795 F.2d 549, 555 (6th Cir. 1986) (citations omitted). Despite Dean and Carley's protestations to the contrary, IW's role as a suspect appears very much in dispute based on the record before us. Statements were made at a November 30, 2007, hearing that IW was a "suspect and/or witness" in this case, and Kane represented that IW was considered by those involved to be a "potential victim,

17

witness and suspect." In fact, the interviews at the school appear to have been follow-up interviews, at the direction of prosecutors, to the interviews conducted by Detective Brousseau at the police station. While there was also testimony that a decision had been made at some point in time that, even if IW had participated in the abuse, he would not be charged, there was nothing to prevent the prosecutors from charging IW if they changed their minds, and IW was never told that he was not a suspect. This conflicting evidence is sufficient to create an issue of fact as to whether Carley and Dean's actions could be characterized as investigative or prosecutorial. While IW was ultimately not arrested or indicted, the purpose of the interviews is distinguishable from that of an interview of a person considered to be exclusively a witness or victim. Thus, the disputed question of fact, whether IW was still a suspect or not at the time, is material and precludes summary judgment in this instance.

Having determined that absolute immunity is not available as a matter of law, we will also consider whether qualified immunity applies with respect to Dean and Carley's interview of IW, which the district court cited as an alternate ground for dismissal. "Qualified immunity is an affirmative defense whereby state officials performing discretionary functions are 'shield[ed] . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). In deciding whether a public official is entitled to qualified immunity, "first, we must inquire whether the facts alleged, when viewed in the light most favorable to the party asserting the injury, show that the public official's conduct violated a constitutional right." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). "Second, if the denial of a constitutional right

18

is demonstrated, we must assess whether that right was clearly established at the time of the alleged violation." *Id*. "The second inquiry requires a determination that the right was so clearly established that a reasonable official would understand that the particular conduct at issue violated that right." *Id*. (citing *Anderson*, 483 U.S. at 640). The third inquiry is whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari*, 499 U.S. 621, 628 (1991) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). No seizure can occur unless the seized person actually submits to the show of authority; however, "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *Brendlin v. California*, 551 U.S. 249, 262 (2007)). Other "circumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"

19

*Smith*, 594 F.3d at 536 (quoting *Mendenhall*, 446 U.S. at 554)) (internal alterations omitted). In determining whether a seizure has occurred, age of the plaintiff is a relevant factor. *See Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005); *United States v. Little*, 18 F.3d 1499, 1505 n.6 (10th Cir. 1994) (en banc).

While the parties do not delve into much detail about the interviews themselves, it appears that IW, a thirteen-year-old child who has been diagnosed with Asperger's syndrome, was removed from class and then interviewed in a separate area while on school grounds. Both prosecutors and police were present during the interviews. There is no allegation that the seizures were supported by a warrant or exigent circumstances. There is no evidence of voluntary consent or that IW would have felt free to leave the interview under those circumstances. Accordingly, viewing the evidence in the light most favorable to Plaintiffs, this scenario seems to fit quite squarely within the parameters of a seizure under well established law. *See Myers*, 422 F.3d at 356; *Jones*, 410 F.3d at 1226. It has long been established that an investigative interrogation of this type must be supported by probable cause to avoid infringing upon an individual's Fourth Amendment right to be free from an unreasonable seizure. *Myers*, 422 F.3d at 356 (citing *Dunaway v. New York*, 442 U.S. 200, 216 (1979)).

Dean and Carley argue that school officials' consent to the interviews may be substituted for IW's consent, relying on *Michael C. v. Gresbach*, 479 F. Supp. 2d 914, 922 (E.D. Wis. 2007). *Gresbach*, however, appears to be wrongly decided. *See New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985) ("In carrying out searches and other disciplinary functions . . . school officials act as representatives of the State. . . ."); *Tenenbaum v. Williams*, 193 F.3d 581, 594 n.9 (2d Cir. 1999) ("The handing over of a child from a public school teacher to another State official, then, is not the

20

equivalent of the consent of the parents."). Dean and Carley do not point to any evidence that this was not a seizure. In light of the well-established contours of the Fourth Amendment in this context, it was objectively unreasonable for Dean and Carley to subject IW to an interview of this type without consent. Thus, qualified immunity is not available to Dean and Carley as a matter of law.

We reverse the district court's dismissal of IW's Fourth Amendment claim against Dean and Carley.

**D.**      **Absolute prosecutorial immunity for the substantive due process claims.**

Plaintiffs claim that Dean and Carley violated their right to substantive due process when, "knowing [that] FC was a 'hoax,' [they] attempted to fabricate incriminatory information" by "repeatedly interviewing AW using FC without regard to the appropriate protocols." [Op. and Order, R. 288 at 9.] Plaintiffs argue that the district court erred by finding that Carley and Dean were entitled to absolute prosecutorial immunity on these claims. We do not agree. The district court correctly found that the prosecutors are entitled to absolute immunity for their actions during AW's interviews; therefore, that decision is affirmed.

"[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 46 (1998) (internal quotation marks and citations omitted). Plaintiffs argue that, on the facts in this case, the falsification of evidence through AW's interviews  is "so egregious that it can be said to be arbitrary in the constitutional sense." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (internal quotation marks and citations omitted); *Hirmuz v. City of Madison Heights*, 469 F. Supp. 2d 466, 481 (E.D. Mich. 2007).

21

Dean and Carley argue that, irrespective of whether a constitutional violation occurred, their actions were "intimately associated with the judicial phase of the criminal process" and, thus, they are entitled to absolute immunity using the functional approach. *Imbler*, 424 U.S. at 430 31; *see also Higgason v. Stephens*, 288 F.3d 868, 878 (6th Cir. 2002) (holding that prosecutors are absolutely immune for "professional evaluation of the evidence assembled").

At issue in this instance are the interviews that Dean and Carley conducted with AW on January 14, 16, and 18, and immediately after the FC hearing in this matter on January 28 29. It is not disputed that these interviews were conducted while the prosecutors were preparing their case, that AW was a witness, and that she offered the only evidence in support of the prosecutors' case. At the time of these interviews, Thal and Julian Wendrow had already been charged, and AW and IW had already been removed from the home. These interviews were solely related to Dean and Carley's preparations for AW to serve as a witness at trial or in upcoming hearings. Dean and Carley are, thus, entitled to absolute immunity for their role in them even if their decision to let the interviews be conducted using FC meant that the statements ascribed to AW were fabricated because they were "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430 31; *see Higgason*, 288 F.3d at 876 77; *Spurlock v. Thompson*, 330 F.3d 791, 797 98 (6th Cir. 2003) (citing *Imbler*, 424 U.S. at 413).

While Plaintiffs argue that there is an exception to the application of absolute immunity in certain situations where prosecutors have falsified evidence, no blanket exception has been applied. *See*, *e.g.*, *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (holding that prosecutors who knowingly obtained false statements during the investigative stages, before the grand jury was empaneled, were not entitled to absolute immunity); *Moore v. Valder*, 65 F.3d 189, 194 95 (D.C.

22

Cir. 1995) (holding that intimidating and coercing witnesses is not advocatory, but investigatory). The distinction remains the prosecutor's function at the time of the malfeasance, rather than the falsification itself. "As the Court concluded in *Imbler*, even the knowing presentation of false testimony at trial is protected by absolute immunity." *Spurlock*, 330 F.3d at 797 98 (citing *Imbler*, 424 U.S. at 413). Because the interviews of which Plaintiffs complain were conducted as part of Dean and Carley's prosecutorial role, Dean and Carley are entitled to absolute immunity on Plaintiffs' substantive due process violations as a matter of law.

We affirm the district court's decision granting absolute immunity to the prosecutors for their actions during AW's interviews.

E.    **Qualified immunity for Plaintiffs' substantive due process claims against Robydek.**

Plaintiffs claim that Robydek violated their constitutional rights by producing IW for an interrogation at the police station and subjecting AW to a gynecological exam without court order, parental consent or notification of their guardian ad litems. The district court declined to find that Robydek was entitled to qualified immunity on these grounds because Robydek did not address these factual bases for Plaintiffs' claims in her motion for summary judgment. Robydek argues that this Court "may exercise jurisdiction over the appeal to the extent it raises questions of law," *Lubelan*, 476 F.3d at 403, even if these defenses were not specifically made part of the substantive motion for summary judgment below. However, "failure to present an issue to the district court forfeits the right to have the argument addressed on appeal." *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006).

We therefore affirm the district court's denial of qualified immunity on this claim.

23

**F.      Governmental immunity for Burke on the gross negligence claim**

Plaintiffs claim that Veronica Burke, WLCSD's Special Services Coordinator, was grossly negligent because she: (1) attended and orchestrated court hearings, meetings with the prosecutors and police, and the interview of AW at the CARE house, outside of the scope and authority of her duties; (2) directed WLCSD employees to attend prosecution-related activities; (3) failed to follow advice from Dr. McClennan and direct orders from her superior, Brown, to procure naïve facilitators during the interviews; (4) provided false information or failed to provide necessary information to the law-enforcement authorities regarding AW's cognitive development and ability to communicate; and (5) failed to ensure that Scarsella and Miller were fully trained in FC.  For the following reasons, this Court affirms the district court's determination to deny governmental immunity to Burke on Plaintiffs' claim of gross negligence.

Under Michigan's governmental immunity statute, governmental employees such as Burke are immune from tort claims occurring during the course of their employment if all of the following are met:

> (a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The . . . employee's . . . conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

Mich. Comp. Laws § 691.1407(2) (2005); *Maiden v. Rozwood*, 597 N.W.2d 817, 824 (Mich. 1999). The parties dispute the first and third requirements for analysis.  "If reasonable jurors could honestly reach different conclusions regarding whether conduct constitutes gross negligence, the issue is a

24

factual question for the jury. However, if reasonable minds could not differ, the issue may be determined by a motion for summary disposition." *Oliver v. Smith*, 810 N.W.2d 57, 62 (Mich. Ct. App. 2010) (citing *Jackson v. Saginaw Co.*, 580 N.W.2d 870, 873 (Mich. 1998)). The defendant has the burden of establishing that she is entitled to immunity. *Id.* at 61.

With respect to the first requirement, Burke offers no description of her job, but argues that her actions were taken in the course and scope of her job duties. According to her supervisor, Brown, Burke was responsible as the Special Services Coordinator for coordinating Autism Spectrum Disorder programs with regular school programs. In that role, she "supports the classroom teachers in the basic classroom programs. She attends meetings with teachers and parents to problem solve. She provides resources to the teachers that they may need." Plaintiffs contend that Burke's attendance at court hearings and investigative interviews, such as that at the CARE House, as well as Burke's participation in meetings with the prosecutors and police, were all outside the course and scope of her duties because they were not taken for the purpose of AW's education. Alternatively, Plaintiffs argue that this issue is, at least, a factual question for a jury. We need not reach this issue, however, because the third requirement presents a jury question.

Burke must show that her conduct was not grossly negligent and was not the proximate cause of Plaintiffs' injuries. "Conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results" constitutes gross negligence. M.C.L. § 691.1407(7)(a); *Oliver*, 810 N.W.2d at 62 (internal citations omitted). To be liable for gross negligence, the employee must exhibit "a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver*, 810 N.W.2d at 62 (citing *Tarlea v. Crabtree*, 687 N.W.2d 333, 339 (Mich. Ct. App. 2004)). "Furthermore, the grossly negligent conduct must be '*the* proximate cause' of the plaintiff's injuries,

25

that is to say 'the one most immediate, efficient and direct cause.'" *Tarlea*, 687 N.W.2d at 339 (citations omitted).

Once she learned of AW's allegations, Dr. McClennan spoke with Brown, Burke's supervisor, to inform her that it was imperative that a naïve facilitator validate the allegations. Dr. McClennan and Brown discussed several candidates fitting that description and ultimately identified a facilitator who worked with AW a few months before at the middle school. Although Brown directed Defendant Burke, her subordinate, to procure a naïve facilitator for use during AW's interview, there is no evidence that Burke made any attempt to do so. Even later in the investigation, Dr. McClennan again asked Brown and Burke to schedule another facilitator to assist with AW, but to no avail. Other facilitators who worked with AW could have been contacted, including AW's regular afternoon facilitator at the high school, or one of the facilitators that AW had worked with while she was in middle school less than a year earlier. However, even the facilitator that Brown and Dr. McClennan had determined would be the most appropriate for the CARE House interview was never contacted for assistance. The evidence indicates that Miller and Scarsella, with whom the original allegations had surfaced, were the only facilitators used throughout the investigation.

There is also evidence that Burke was aware that Miller and Scarsella needed additional training in FC and had not yet arranged for them to receive it, despite Dr. McClennan's efforts. Miller and Scarsella received less training than the teachers and aides that had used FC with AW in the sixth, seventh, and eighth grades. Burke attended two two-hour training sessions. Miller attended four training sessions with Dr. McClennan, but Scarsella had only one hour of training in the use of FC. Miller and Scarsella testified that they did not always facilitate communication in the manner in which they were taught or consistently with Dr. McClennan's training. Although training

26

materials describing specific authentication protocols for significant or sensitive communications made through FC, such as allegations of abuse, had been provided to Scarsella and Miller by Dr. McClennan, Scarsella and Miller did not follow those authentication protocols and later testified that they did not remember receiving materials on those topics.

Furthermore, Burke and Scarsella did not inform the other investigators of the need for a naïve facilitator; that FC was a controversial technique; that the Wendrows had recently complained about the lack of training of the new facilitators and use of FC at the high school; or that AW had recently experienced difficulty in school and in performing many basic, age-appropriate tasks (i.e. dressing herself, brushing her hair, and using bathroom facilities). Burke and Scarsella told the attendees that AW was doing well in school, that her parents approved of the use of FC, and that she used FC in school.

Burke argues that Dr. McClennan was the professional responsible for training Miller and Scarsella. However, Burke's job description implies that Burke herself is responsible for making training available. Moreover, Dr. McClennan testified that she tried to schedule additional training with Miller and Scarsella, but was unable to continue training as she had hoped. Burke further argues that she cannot be responsible for failing to inform law-enforcement officials about the controversial nature of FC because she was only aware of this information after AW's initial report of abuse. Burke's argument is unconvincing. Viewing the evidence in the light most favorable to Plaintiffs, Burke was aware of AW's level of functioning, as well as the proper protocol for authenticating allegations of abuse for FC when the Care House interview occurred and when she spoke with law-enforcement officials, yet evidence suggests that she failed to fully inform them of that information. At the time of the CARE House interview, Julian had not been charged, and AW

27

and IW had not been formally removed from the home. Thus, it was not too late to change the course of the investigation.

Considering that there is evidence in the record from which a jury could find that Burke failed, or did not even attempt, to procure a naïve facilitator who could assist with the interview, and that she failed to disclose information that addressed factors which prosecutors considered important to their analysis of the case, there is sufficient evidence from which a jury could conclude that Burke was so reckless as to demonstrate a substantial lack of concern for whether injury resulted. Based on the evidence in the record, reasonable minds could differ on whether Burke's actions were grossly negligent and whether her actions could be considered the proximate cause of Plaintiffs' injuries. *Oliver*, 810 N.W.2d at 62. Accordingly, the question of Burke's gross negligence is an issue for the jury. The district court's opinion is affirmed.

### G. Governmental immunity for intentional tort state claims

For governmental immunity to apply under Michigan law, the individual defendants must demonstrate that the actions allegedly constituting the intentional state-law torts (a) were undertaken during the course of employment and the employee was acting or reasonably believed that he was acting within the scope of his authority; (b) that the acts were undertaken in good faith or were not undertaken with malice; and (c) that the acts were discretionary, as opposed to ministerial. *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 667 68 (Mich. 1984). The burden to raise and prove entitlement to immunity falls upon the government employee. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 227 28 (Mich. 2008).

28

## 1. Dean and Carley

Plaintiffs argue that the district court erred when it dismissed their claims of defamation, intentional infliction of emotional distress, invasion of privacy, malicious prosecution and abuse of process against Dean and Carley on the basis that Dean and Carley's actions were taken in good faith as a matter of law and that governmental immunity shielded them from the claims. The district court reasoned that Dean and Carley believed that AW was the author of the FC statements and, thus, they did not proceed in such a "reckless fashion as to call into question their stated good faith or lack of intent to harm." Although the district court considered Plaintiffs' claims that Dean and Carley were incorrect about their reliance on FC, the district court held that the prosecutors' incorrect belief merely amounted to negligence, which is insufficient to establish a lack of good faith in the governmental-immunity analysis. The district court relied on evidence of Dean and Carley's belief that the family earlier considered FC reliable and that they had learned that Scarsella and Miller were good facilitators. However, the district court did not devote any significant analysis to the evidence that Dean and Carley knew that they were using inappropriate protocols for FC and that their failure to do so necessarily exhibited reckless indifference to whether AW's statements were authentic and, thus, whether harm would result such that their behavior was tantamount to willingness for harm. *Odom*, 760 N.W.2d at 225. Likewise, the district court did not analyze the intentional torts that were not based on the use of FC with AW. These intentional tort claims present material questions of fact not recognized by the district court and, for that reason, we reverse the district court's dismissal of the state law intentional tort claims against Dean and Carley.[2]

---

[2] In reversing, we do not express an opinion as to the reach of common-law absolute immunity to these state-law claims because Dean and Carley did not present an absolute-immunity argument. However, we do note that it appears to be an open question as to whether Michigan's

29

### a. FC Torts

Plaintiffs proffered evidence from which a reasonable jury could find that Dean and Carley knew, or should have known, that proper FC protocols were not being used with AW during the interviews, that AW was not the author of her statements, and that harm would result. With respect to the intentional torts that relied upon the use, or misuse, of FC, there is sufficient evidence that Dean and Carley knew or should have known that the procedures that they were using were not within FC protocols for sexual-abuse allegations and that specific safeguards should have been utilized, but were not. To determine the lack of good faith, courts should consider whether there is evidence of "malicious intent, capricious action or corrupt conduct." *Odom*, 760 N.W.2d at 225 (citing *Veldman v. Grand Rapids*, 265 N.W. 790, 794 (Mich. 1936); *Amperse v. Winslow*, 42 N.W. 823, 827 (Mich. 1889)). "Willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference as to whether harm will result as to be the equivalent of a willingness that it does" and may be demonstrated by the conduct of or the failure to act by the defendant. *Odom*, 760 N.W.2d at 225 (citing *Burnett v. City of Adrian*, 326 N.W.2d 810, 812 (Mich. 1982)).

Plaintiffs contend that the evidence in AW's school file, including information about her IQ and English skills, as well as the video of the CARE House interview, and the prosecutors' interactions with AW in general, should have put Carley and Dean on fair notice that AW was

---

1986 governmental-immunity statute eliminated the common-law absolute immunity that Michigan previously afforded to lower-level prosecutors for their quasi-judicial actions. *See Bischoff v. Calhoun Cnty. Prosecutor*, 434 N.W.2d 249, 252 (Mich. Ct. App. 1988) (discussing the common-law immunity doctrine applied in *Payton v. Wayne Cnty.*, 357 N.W.2d 700, 704 05 (Mich. Ct. App. 1984)); *See also Cheolas v. City of Harper Woods*, No. 06-11885, 2009 WL 388548, at *9 (E.D. Mich. Feb. 13, 2009) (noting that "the Michigan courts have recognized the continued existence of common-law prosecutorial immunity as a complement to this statutory grant of immunity").

functioning at lower than grade level. Additionally, there is evidence that the prosecutors were aware of the errors in AW's statements, such as misidentifying people and places.

Moreover, Plaintiffs offered evidence that Dean was directly aware of the issues with FC and the failure to use proper protocols. Dean called Dr. McClennan as an expert at the hearing regarding FC because she could not find another suitable witness to support FC, despite her orders from Carley not to use Dr. McClennan as an expert witness. Dean testified that she had tried to contact approximately ten individuals knowledgeable about FC but was unable to find anyone other than Dr. McClennan who was knowledgeable and able to support its use. Dean even conceded that there was at least one person who was "adamant that it was not a reliable method." Moreover, Dr. McClennan and at least one other expert stressed that the proper protocols were not being followed in this case. In preparing for the hearing, Dr. McClennan tried to reiterate her concerns about the proper FC protocols and validation techniques, but Dean did not want to talk about them, indicating that she would avoid the topic at the hearing. Dr. McClennan felt so strongly that the protocols should be discussed at the hearing that she called opposing counsel to discuss them. Thus, there is evidence from which a jury could conclude that prosecutors intentionally tried to avoid eliciting testimony from Dr. McClennan at the court hearing that the proper protocols had not been used during AW's interviews regarding the sexual-abuse allegation. This counsels against good faith. Dean had also investigated FC on her own, by talking with experts and watching a PBS Frontline special on FC. Dean admitted that she knew of certain protocols to verify that a child understands letters and spelling, but that she made no effort to find out if they had been tried with AW or to conduct them herself. Moreover, Dean and Carley failed to follow state and local policies requiring someone familiar with AW, as well as a neutral expert, to assess her communication abilities and needs.

31

Viewing the evidence in the light most favorable to Plaintiffs, a jury could find that by ignoring even the basic recommendations of the experts consulted, Dean and Carley allowed the perpetuation of the sexual-abuse allegations. In short, there is evidence to suggest that Dean and Carley were aware of significant issues with the use of FC, as well as AW's cognitive abilities and that they chose to ignore appropriate protocols or chose not to make any effort to safeguard against the known dangers of the use of FC. Such information, if considered in a light most favorable to Plaintiffs, would provide a basis for a reasonable jury to conclude that Dean and Carley demonstrated such "indifference to whether harm [would] result as to be the equivalent of a willingness that harm it does." *Odom*, 760 N.W.2d at 225. Thus, we reverse the district court's decision as to the intentional torts that related to Dean and Carley's purported reliance on FC including the claims for intentional infliction of emotional distress, malicious prosecution, and abuse of process.

### b. Non-FC Torts

Plaintiffs note that several of the intentional torts were not based upon the use of FC at all and, thus, the district court's analysis of Dean and Carley's good-faith reliance on FC was inapposite. For example, Plaintiffs note that the defamation claim was based on, among other statements, Dean's alleged statement that AW's medical exam revealed tears "consistent with sexual abuse." Dean and Carley's purported good-faith belief in the reliability of FC did not bear on the question of whether that statement could reasonably be interpreted as truthful. Similarly, Plaintiffs point to the invasion-of-privacy claim based on, among other statement, the disclosure of IW's Asperger's diagnosis; and a false-light invasion-of-privacy claim based on Dean's statement that the Wendrows had been proponents of FC up until the allegations surfaces. Plaintiffs are correct that the district court's

governmental-immunity reasoning simply does not apply to these claims. Thus, even if we agreed with the district court's determination that the prosecutors relied in good-faith on the FC-communications which we do not we would still reverse the district court's dismissal of these non-FC-related torts.

We note that Dean and Carley argue that the district court's summary-judgment order may be affirmed in any case because the claims at issue also fail as a matter of law. The briefing does suggest that some of the claims require close scrutiny. However, because we believe each of these claims requires weighty factual and legal determinations, we leave these determinations to make in the first instance. At this stage, therefore, we reverse the qualified-immunity/summary-judgment dismissal of these intentional tort claims, and remand them to the district court for further consideration.

### 2. Robydek

On appeal, Robydek argues that she is protected by governmental immunity because her actions were taken in good faith and authorized under the Michigan's Child Protection Law, M.C.L. § 722.621. Plaintiffs argue that Robydek's false statements to third parties, removal of AW and IW from their home, transport of IW for interrogation, and role in obtaining a gynecological exam for AW were contrary to her job duties and were not taken in good faith. We conclude that the district court properly denied governmental immunity to Robydek for Plaintiffs' claims of defamation, intentional infliction of emotional distress, invasion of privacy (intrusion into private affairs and public disclosure of private facts), false imprisonment, and battery. We affirm the district court's denial of governmental immunity on all claims against Robydek.

33

### a. False Statements to Third Parties

First, Plaintiffs claim that Robydek allegedly made false statements to Irene Flam on December 4, 2007, when Robydek stated that IW confirmed the accusations against Julian Wendrow during IW's interrogation at the police station. This purported false statement, *inter alia*, forms the basis of Plaintiffs' defamation claim, as well as claims for invasion of privacy for intrusion into private affairs and public disclosure of private facts. Robydek argues that the statements were authorized because M.C.L. § 722.954 requires that foster-care providers be provided with information about the child's history of abuse and neglect, any known emotional and psychological problems, and any other information necessary for the foster family to provide a stable, safe, and healthy environment. While Robydek does not deny making the statements, she argues that the statements were not false and were made in good faith. Robydek, however, does not appear to have witnessed the entire interrogation. She does not explain which of IW's statements during the interrogation would have supported her statement to Flam; whether she witnessed the admissions personally; or whether she heard about them from others or read them in the police report. Plaintiffs have put forth enough evidence to create a disputed question of fact as to Robydek's good faith. Thus, this issue remains a question of fact for a jury, and we affirm the denial of governmental immunity.

### b. Removal of IW and AW from the Wendrows' Home

Second, Plaintiffs contend that Robydek was acting outside of her authority when she removed IW and AW from their parents' care. Robydek relies on M.C.L. §§ 722.628(1) and (3)(b), which give Robydek the authority to refer the report to law enforcement to determine if a parent abused a child and to cooperate with the investigation. However, there is evidence suggesting that

34

Robydek's determination that AW and IW should be taken from the home does not comply with standard procedure. Based solely upon the allegations made by AW through FC, Robydek removed IW and AW from their home. DHS typically investigates and corroborates the allegations before acting, rather than basing the determination solely on the statements of the victim, as was done in this case. In fact, Robydek's supervisor, Mary Lou Maroney, also told Robydek to act as if the statements of AW were not given because they "did not know if [FC] was a reliable technique." [R. 244-1 at 8529.]

Additionally, Robydek did not look into the validity of FC after using the system to facilitate the allegations from AW, and she ignored repeated efforts of others to educate her on the proper FC protocols for this type of allegation. Julian Wendrow left at least three messages for Robydek to inform her that specific authentication protocols for using FC should be followed, such as using a naïve facilitator who was unaware of the allegations to duplicate the communication. The children's grandmother also spoke with Robydek in an effort to educate her about FC. Robydek's actions are especially troubling in this situation given the multiple documented errors in the facilitated statement used as the sole basis for Robydek's recommendation. Viewing the evidence in a light most favorable to Plaintiffs, given Robydek's failure to comply with normal procedure and refusal to follow her supervisor's directions, the district court did not err by finding that Robydek had not met her burden to show that she was acting within the scope of her authority and in good faith.

### c. IW's questioning by police

Third, Plaintiffs contend that Robydek did not have the authority to turn over IW to the police for questioning, which is the basis for IW's false-imprisonment claim. IW has been diagnosed with a mild form of autism known as Asperger's Syndrome. In the course of the transport to a new foster

placement, without notifying IW's guardian ad litem or the Wendrows, Robydek took a detour to the police station so that IW could be further questioned. There is evidence in the record that IW did not feel free to leave, was not read his *Miranda* rights, was considered to be a suspect at that time, and was held for several hours. As evidence of her authority to have IW questioned by the police, Robydek cites M.C.L. § 722.628c, which provides that the "child reported to have been abused or neglected shall not be interviewed in the presence of an individual suspected to have perpetrated the abuse." Robydek was permitted to interview IW to ascertain whether he had been abused or witnessed abuse and, in fact, she and another colleague interviewed IW. She also argues that she delivered IW as part of her duty to cooperate with police throughout the investigation. Neither argument passes muster. There is no authority authorizing an interrogation by police or indicating that Robydek would be permitted to produce IW for investigative questioning by the police without consent or warrant. Further, there is no authority that Robydek's duty to cooperate in the investigation extends so broadly or that Robydek had authority to consent to the custodial questioning on IW's behalf. Thus, we conclude that Robydek did not meet her burden to establish that she was acting within the scope of her authority when she produced IW for questioning.

### d. AW's gynecological exam

Finally, Robydek's decision to take AW for a gynecological exam without court order or consent of a guardian forms the basis of Plaintiffs' intentional tort battery claim, among others. Relying on M.C.L. § 722.124a, which gives the department the authority to "consent to routine, nonsurgical medical care, or emergency medical and surgical treatment of a minor child placed in out-of-home care," Robydek argues that she had the authority to proceed with these actions. However, a gynecological exam for a young girl is not within the realm of routine or emergency

36

medical care under M.C.L § 722.124a. Instead, an investigatory gynecological exam would fall under M.C.L. § 722.626, which governs the medical examination of a child suspected of being abused or neglected. Pursuant to M.C.L.§ 722.626(3), the department must request a court order for a medical examination unless the child's health is seriously endangered and a court order cannot be obtained, or the child is displaying symptoms of exposure to methamphetamine production. There is no indication that AW's health required exigent intervention at the time of the exam.

In *Lavey v. Mills*, 639 N.W.2d 261 (Mich. Ct. App. 2001), a child protective services worker and a policeman took a disabled child who could not speak to have a gynecological exam without the court order required by § 722.626(3) after complaints from her teacher about suspected abuse. The child's guardian asserted claims of battery and false imprisonment. *Id.* at 264. The court denied immunity because the defendants violated § 722.626(3). *Id.* at 267 68. Robydek argues that *Lavey* is distinguishable because AW was in state custody at the time of the exam. However, the statutes in question make no such distinction. Investigatory exams of this type fall squarely within § 722.626(3) rather than routine care under M.C.L. § 722.124a. Thus, Robydek is not entitled to governmental immunity on these claims.

Robydek also did not meet her burden to show that she was acting in good faith. "The good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Odom*, 760 N.W. 2d at 229. A reasonable jury could conclude that Robydek was not acting in good faith as described in the *Ross* test because she made false statements to third parties, falsified or made "corrections" to AW's statements, produced IW for interrogation, and took

37

AW for a gynecological exam. Thus, Robydek is not entitled to governmental immunity for the claims stemming from this conduct, and we affirm the district court's decision.

### 3. Claims Based on "Corrected" or Fabricated FC Statements

The claims against Robydek, Miller, and Scarsella for defamation and intentional infliction of emotional distress are founded upon the allegation that Robydek, with the assistance of Scarsella and Miller, "corrected" statements in AW's facilitated interviews or fabricated statements, thereby concealing evidence of the reliability of FC and resulting in additional charges against the Wendrows. Defendants deny that they fabricated or corrected any statements. The district court's determination to deny governmental immunity to Robydek, Scarsella, and Miller for the defamation and intentional infliction of emotional distress claims resulting from the falsification or modification of AW's statements is affirmed.

Specifically, Plaintiffs allege that AW's facilitated statement on December 5, 2007, was "cleaned up" by Robydek, Scarsella, Miller, and an officer assigned to the school when they noticed inaccuracies in the statement. For example, AW facilitated that "Bossy" is AW's sister, though AW did not have a sister. There is evidence indicating that the officer told AW "no," and they deleted it from the computer. They tried again, at Miller's direction, and Miller facilitated that "Bossy" is Julian's sister, which is what appears in AW's statement that was provided to the police. No one indicated that the statement had been corrected or manipulated.

Plaintiffs allege that in addition to the false statements made in an effort to "clean up" statements made by AW, false statements were made by Burke, Scarsella, and Miller throughout the course of the investigation regarding AW's abilities, the veracity of the allegations, and the Wendrows' alleged plans to flee with AW. False statements of this nature would not fall within the

38

scope of cooperation in an investigation as argued by Defendants. A jury could find that such actions are not within the scope of Defendants' job duties. Burke, Miller and Scarsella argue that, because FC had been used in the past, they had no reason to believe that the statements were false. However, as time went on, more evidence became available through the Wendrows and Dr. McClennan about the reliability of FC, particularly when used to authenticate abuse. Moreover, when the evidence is viewed in the light most favorable to Plaintiffs, the flaws that arose while Miller and Scarsella were using FC should have alerted those involved that something was amiss. Taking the evidence in a light most favorable to Plaintiffs, as this Court must, a jury could find based on the repeated warnings of Dr. McClennan and the Wendrows that Defendants had reason to believe that the allegations of abuse and flight were false as the investigation progressed past the initial report of abuse. Making false statements is neither within the scope nor for the purpose of cooperating with an ongoing investigation. Thus, such acts would not be within the scope of Burke, Scarsella, and Miller's authority.

While Miller and Scarsella deny falsifying these statements, this Court must consider the evidence in a light most favorable to Plaintiffs. Further, because Robydek, Miller, and Scarsella deny falsifying or modifying the statements, they cannot reasonably assert that they falsified or modified the statements in good faith. *See Lemon v. Boudreau*, No. 09-92581, 2012 WL 5065059, at *3 (Mich. Ct. App. Oct. 18, 2012) (unpublished) ("[B]ecause defendants deny hitting plaintiff, defendants cannot establish that if plaintiff was hit, he was hit in good faith.") To the extent that these actions are denied, a fact question exists as to Defendants' good faith, and thus Defendants are not entitled to governmental immunity.

39

Plaintiffs next allege that Scarsella and Miller made false and defamatory statements about the Wendrows to third parties by facilitating false allegations through FC. Based on the evidence regarding the potential for the facilitators to consciously or subconsciously author statements through FC as well as the various inconsistencies in the statements themselves, and the result of the post-hearing interviews in which Miller and Scarsella did not hear the questions posed to AW a jury could conclude that Miller and Scarsella intentionally made these incriminating statements about abuse and fleeing against the Wendrows. Moreover, evidence suggests that Miller and Scarsella were not facilitating AW's statements consistently with their training. Again, this is evidence that would suggest to a trier of fact that they were acting outside of the scope of their authority, and could suggest a lack of good faith the second *Ross* prong.

Accordingly, the district court's denial of governmental immunity to Robydek, Scarsella, and Miller based on the defamation and intentional infliction of emotional distress claims resulting from the falsification or modification of AW's statements is affirmed.

### 4. Other Torts against School-District Defendants

The district court found that, while governmental immunity was raised as a defense, Defendants failed to analyze or discuss the *Ross* elements and, therefore, the district court declined to find that governmental immunity applied for the intentional tort claims[3] against Defendants Burke,

---

[3] The claims at issue against Burke are Intentional Infliction of Emotional Distress (Count 51), Invasion of Privacy Intrusion into Private Affairs (Count 52), and Malicious Prosecution (Count 55). Plaintiffs claims against Brown are Intentional Infliction of Emotional Distress (Count 51), and Malicious Prosecution (Count 55). The claims remaining against Miller and Scarsella are Defamation (Count 50), Intentional Infliction of Emotional Distress (Count 51), Invasion of Privacy Intrusion into Private Affairs (Count 52), Invasion of Privacy Public Disclosure of Private Facts (Count 53), and Malicious Prosecution (Count 55). One additional claim of invasion of privacy false light is at issue regarding Scarsella.

Brown, Miller and Scarsella. These defendants offer little to no analysis of the specific acts which serve as the foundation for Plaintiffs' claims. *Ross*, 363 N.W.2d at 668 ("[T]o determine the existence and scope of the individual's immunity from tort liability in a particular situation, the specific acts complained of, rather than the general nature of the activity, must be examined."). The defendant bears the burden of establishing the entitlement to governmental immunity under Michigan law. *See Odom*, 760 N.W.2d at 227 28. We agree with the district court that the school district defendants raised the governmental-immunity defense only in a perfunctory manner, and thus their arguments were insufficient to establish immunity. Although these defendants seek to supplement their governmental-immunity analysis on appeal, "[w]e review the case presented to the district court rather than a better case fashioned after the district court's order." *Chao v. Hall Holding Co.*, 285 F.3d 415, 427 (6th Cir. 2002) (internal quotation marks omitted). Accordingly, we affirm the district court's decision to deny governmental immunity to the school-district defendants on the intentional tort claims.

## IV.

For all of the reasons stated above, the district court's judgment is **AFFIRMED IN PART**, **and REVERSED IN PART**, and this matter is, therefore, **REMANDED** for further proceedings consistent with this opinion.