RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0020p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

LEDURA WATKINS,

*Plaintiff-Appellee*,

*v.*

No. 20-1074

ROBERT H. HEALY, in his individual capacity,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:17-cv-13940—Matthew F. Leitman, District Judge.

Argued:  December 2, 2020

Decided and Filed:  January 28, 2021

Before:  MOORE, GILMAN, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellant.  Wolfgang Mueller, MUELLER LAW FIRM, Novi, Michigan, for Appellee.  **ON BRIEF:**  Davidde A. Stella, WAYNE COUNTY CORPORATION COUNSEL, Detroit, Michigan, for Appellant.  Wolfgang Mueller, MUELLER LAW FIRM, Novi, Michigan, for Appellee.

───────────────

## OPINION

───────────────

KAREN NELSON MOORE, Circuit Judge.  In 1976, 19-year-old Ledura Watkins was convicted of the murder of Yvette Ingram and sentenced to life in prison without the possibility

of parole.  The State of Michigan's case against Watkins hinged on a begrudged schoolfellow and a single hair:  Watkins's 20-year-old high school classmate Travis Herndon testified that he and Watkins robbed and murdered Ingram together, and Detroit Police Department Evidence Technician Ronald Badaczewski testified that a hair found on Ingram's clothing matched a hair sample of Watkins.  After Watkins's conviction, Herndon repeatedly recanted.  In sworn affidavits, letters, and testimony, Herndon continuously attested that Wayne County Prosecutor Robert H. Healy and Detective Neil Schwartz threatened to charge him with Ingram's murder and another unrelated murder if Herndon did not tape a statement that implicated Watkins and testify to that effect at Watkins's trial.  Yet Watkins's efforts to overturn his conviction were of no avail for four decades.  In January 2017, Watkins presented to the state trial court new evidence that Badaczewski's hair analysis methods were seriously flawed.  Based on this new evidence, the state trial court dismissed the case against Watkins without prejudice.

In December 2017, Watkins filed a 42 U.S.C. § 1983 suit against Healy, the estate of Schwartz, Badaczewski, and the City of Detroit.  Healy responded with a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss.  The district court denied Healy's motion, and this appeal ensued.  Although we lack appellate jurisdiction to consider most of Healy's arguments, we hold that Healy is not entitled to absolute immunity for his alleged actions and that Healy has forfeited the issue of qualified immunity at this stage of the suit.  Accordingly, we **AFFIRM**.

## I.  BACKGROUND

On September 6, 1975, schoolteacher and drug dealer Yvette Ingram was robbed and shot dead in her Detroit home.  R. 30 (Am. Compl. at 4) (Page ID #7490).[1]  The Detroit Police Department ("DPD") had no leads on Ingram's murder until October 14 of that year, when 20-year-old Travis Herndon was arrested for an unrelated armed robbery.  *Id.* at 5 (Page ID #7491).

---

[1]Because this is a review of the district court's denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6), we must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in [the plaintiff's] favor."  *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).  Accordingly, we draw the background section largely from Watkins's amended complaint, R. 30 (Am. Compl. at 1) (Page ID #7487), and we acknowledge where Healy concedes Watkins's allegations.

Healy observes that Ingram was a "high school teacher and part-time drug dealer" and that Ingram was murdered on September 6, 1975.  Appellant's Br. at 4.

While in custody, Herndon told a police officer that 19-year-old Ledura Watkins robbed and killed Ingram on the orders of Gary Vazana, a corrupt police officer and drug dealer. *Id.*[2] Days later, Robert H. Healy—an Assistant Prosecuting Attorney for Wayne County—and Neil Schwartz—a DPD Sergeant—interrogated Herndon about the Ingram murder. *Id.* at 2–3, 5 (Page ID #7488–89, 7491). Herndon told a different story to Healy and Schwartz; Herndon now asserted that both Watkins and Herndon, acting on Vazana's orders, drove Vazana's car to Ingram's home and "used Vazana's pistol to kill Ingram." *Id.* at 6 (Page ID #7492).[3] At some point, Healy left the interrogation room before returning and passing a note to Schwartz. Schwartz read the note and purportedly handed it to Herndon. *Id.* "The note indicated that Vazana had been found shot to death in his residence." *Id.* Healy left the room again. *Id.* at 7 (Page ID #7493).[4]

Schwartz apparently "attempted to have Herndon make a tape-recorded statement implicating [] Watkins." *Id.* But Herndon allegedly changed his tune for a third time:

> Herndon specifically told S[chwartz] that his earlier statement about Ledura Watkins'[s] involvement was not true. Herndon told S[chwartz] that Vazana drove Herndon to Yvette Ingram's house and robbed and killed her, with Vazana shooting Ingram twice in the head while she was on her bed. Herndon specifically told S[chwartz] that Watkins was not involved in the Yvette Ingram murder.

*Id.* Schwartz then reportedly joined Healy outside the interrogation room, where "H[ealy] and S[chwartz] conspired and agreed to frame [Watkins] by fabricating evidence that Herndon and

---

[2]Healy accepts that "Herndon voluntarily told HPPD personnel, including a Detective Donald Roberts (deceased), that . . . Watkins had murdered Ingram on the orders of a corrupt Highland Park police officer named Gary Vazana." Appellant's Br. at 4–5. Healy contends that Vazana was "[a]ssigned to Highland Park High School beginning in 1970 or 1971 [and] became acquainted with both Herndon and Watkins, who were both students there." *Id.* at 5.

[3]Healy confirms that, at this point in the interrogation, "Herndon identified Vazana as the organizer, Watkins as the murderer, and himself as the accomplice." Appellant's Br. at 6.

[4]Healy affirms that "[a]t some point during the day, [] Healy returned briefly to the room and handed Sergeant Schwartz a note indicating that Vazana had been killed." Appellant's Br. at 7. Healy argues, however, that Schwartz did not show the note to Herndon, contrary to Watkins's allegations. *Id.*

Watkins killed Yvette Ingram." *Id.*[5] Healy and Schwartz allegedly returned to the interrogation room, where the following apparently transpired:

> H[ealy] told Herndon that he and S[chwartz] wanted Ledura Watkins for the Ingram murder because they believed he was involved and that he likely murdered Gary Vazana. [] Herndon again told H[ealy] and S[chwartz] that Watkins had nothing to do with the murder, and that Herndon and Vazana killed Ingram. H[ealy] and S[chwartz] threatened Herndon that they would charge Herndon with the Ingram murder unless he implicated Watkins in the murder. H[ealy] stated he would grant Herndon immunity if he testified against Watkins. [] H[ealy] and S[chwartz] also threatened to charge Herndon with the recent murder of Jr. Cunningham, as Herndon was the last individual who was seen with Cunningham before his murder.

*Id.* at 7–8 (Page ID #7493–94). Herndon—who purportedly "bore a grudge against Watkins and believed that Watkins had recently fired shots at Herndon while Herndon was out of jail on bond"—acceded. *Id.* at 8 (Page ID #7494). Schwartz tape-recorded Herndon, who "implicated Watkins in Yvette Ingram's murder[,]" *id.*, and narrated how he and Watkins robbed and killed Ingram on Vazana's orders, R. 34-8 (Taped Statement at 2–3) (Page ID #7973–74).

On October 22, 1975, Schwartz filed a warrant request for Watkins with the Wayne County Prosecutor's Office. R. 30 (Am. Compl. at 10) (Page ID #7496); R. 34-9 (Warrant Req. at 2) (Page ID #7982). Herndon's tape-recorded statement was the "<u>sole basis</u> for probable cause for Watkins'[s] arrest and continued detention, as there was no other evidence linking Watkins to the crime." R. 30 (Am. Compl. at 9) (Page ID #7495).[6] Watkins was arrested that same day. *Id.* at 11 (Page ID #7497).

Watkins's trial commenced on March 8, 1976. Consistent with his tape-recorded statement, Herndon testified that both he and Watkins killed Ingram. *Id.* at 13–15 (Page ID #7499–501); R. 34-16 (Trial Tr. Part 1 at 379–584) (Page ID #8161–8365). DPD evidence

---

[5]Healy portrays the conversation between Schwartz and Healy outside the interrogation room as follows: "At some point after Herndon implicated Watkins, Sergeant Schwartz informed Defendant-Appellant Assistant Prosecuting Attorney Robert H. Healy of these statements. APA Healy came over to speak with Sergeant Schwartz and Herndon about the immunity issue [i.e., whether Herndon would be granted immunity for Ingram's murder in exchange for testifying against Watkins] and then left again." Appellant's Br. at 6.

[6]Healy asserts that Schwartz submitted a warrant request for Watkins "on the basis of Herndon's statements[.]" Appellant's Br. at 7.

technician Ronald Badaczewski testified that a single hair on Ingram's pants "could" have a "common origin" with a sample supposedly taken from Watkins.[7] R. 30 (Am. Compl. at 15–16) (Page ID #7501–02); R. 34-16 (Trial Tr. Part 2 at 669–814) (Page ID #8420–544). Herndon supplied the sole eyewitness testimony that implicated Watkins in Ingram's murder, and the lone hair was the only physical evidence linking Watkins to the scene of the crime. R. 30 (Am. Compl. at 15) (Page ID #7501).[8] Watkins was convicted of first-degree murder on March 16, 1976 and sentenced to life in prison without the possibility of parole. *Id.* at 18–19 (Page ID #7504–05); R. 34-17 (Jury Verdict at 3) (Page ID #8645); R. 34-18 (Sent'g Tr. at 3) (Page ID #8653).

Herndon repeatedly recanted his testimony in affidavits, letters, and at evidentiary hearings.[9] But Watkins's many appeals and post-conviction proceedings[10] yielded no relief until

---

[7]Prior to the trial, Badaczewski had produced a four-page lab report that concluded that hair samples purportedly procured from Watkins and Herndon were "microscopically similar and could have a common origin with several unknown hairs" on Ingram's pants. R. 30 (Am. Compl. at 12) (Page ID #7498). Watkins alleges that Badaczewski's lab report was not turned over to Watkins's defense team until 2012. *Id.* at 24 (Page ID #7510).

[8]Healy points out that other witnesses testified at Watkins's trial. *See* Appellant's Br. at 9–13. He is correct. But the trial transcript reveals that the other witnesses supplied evidence of how the DPD handled the crime scene and hair samples; how Herndon first told the police that he had information about Ingram's murder; and that Watkins knew Vazana, who, again, was a drug-dealing police officer whom the DPD assigned to Herndon and Watkins's school. Only Herndon's and Badaczewski's testimony linked Watkins to the scene of the crime.

[9]On June 12, 1980, Herndon signed two affidavits, one of which recanted his trial testimony and implicated only Vazana in Ingram's murder. R. 30 (Am. Compl. at 19) (Page ID #7505); R. 34-24 (Herndon 1980 Aff. 1 at 5–8) (Page ID #8719–22). About three weeks later, Watkins filed a motion in state court for a new trial based on Herndon's affidavits. R. 30 (Am. Compl. at 19) (Page ID #7505); R. 34-24 (Mot. New Trial at 1–3) (Page ID #8716–18). The court held an evidentiary hearing on October 22 of that year, during which Herndon "recanted his earlier trial testimony[,]" "stated that [Watkins] did not commit the murder of Yvette Ingram[,]" and "implicated Vazan[a][.]" R. 34-26 (1981 Op. at 2) (Page ID #8731); R. 30 (Am. Compl. at 19) (Page ID #7505). The court denied Watkins relief, reasoning that Badaczewski's expert testimony that "one hair" taken from Ingram's pants matched Watkins served as additional grounds for Watkins's conviction, R. 34-26 (1981 Op. at 3) (Page ID #8732), and that "the recanting affidavits and evidentiary hearing testimony of Herndon's [were] lacking in trustworthiness[,]" *id.* at 5 (Page ID #8734).

Since then, Herndon has recanted his trial testimony on at least three more occasions via two letters to Michigan judges and another affidavit. On November 16, 1980, Herndon allegedly sent a letter to the trial court, with the then-Chief Judge copied, "regarding Herndon's false trial testimony." R. 30 (Am. Compl. at 19) (Page ID #7505). On August 12, 2000, Herndon allegedly wrote a letter to Judge Susan Borman, "again admitting to murdering Yvette Ingram and lying at the Watkins trial." *Id.* at 19 n.2. On November 13, 2017, Herndon signed another affidavit attesting to the events during his interrogation as alleged by Watkins. R. 36-8 (Herndon 2017 Aff. at 2–4) (Page ID #9650–52). Watkins does not provide a record cite in his brief for the 1980 letter or 2000 letter. Nor can we find either document in the district court record. But because this is an appeal of a district court's denial of a Rule 12(b)(6) motion, we nonetheless construe Watkins's allegations as true.

this millennium.  On January 19, 2017, Watkins filed a successive motion for relief from judgment with the state trial court, which included an affidavit from a forensic hair-analysis expert that challenged Badaczewski's testimony and hair analysis.[11]  R. 34-48 (2017 Mot. at 1–3) (Page ID #9181–83); R. 30 (Am. Compl. at 24) (Page ID #7510).  The Wayne County Prosecutor's Office moved to dismiss Watkins's case without prejudice.[12]  R. 34-49 (Stip. Order at 1–3) (Page ID #9236–38); R. 30 (Am. Compl. at 25) (Page ID #7511).  On June 15, 2017, the state court vacated Watkins's conviction and sentence and dismissed the case without prejudice.  R. 34-49 (Stip. Order at 3) (Page ID #9238).  Watkins had been incarcerated for over forty-one years for Ingram's murder.  R. 30 (Am. Compl. at 26) (Page ID #7512).[13]

On December 6, 2017, Watkins filed suit pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988[14] in federal court against Healy, Schwartz's estate,[15] Badaczewski, and the City of

---

In his 2017 successive petition for relief, Watkins asserts that Herndon wrote yet another letter to an acquaintance in which he admitted that he testified falsely against Watkins.  R. 34-48 (2017 Mot. at 33) (Page ID #9213).  Because Watkins did not mention this letter in his amended complaint, we do not consider it.

[10]*See People v. Watkins*, 259 N.W.2d 381 (Mich. Ct. App. 1977); *People v. Watkins*, 883 N.W.2d 758 (Mich. 2016).

[11]Watkins also contended that the DPD committed a *Brady* violation; acknowledged that Herndon had recanted in 1980, 2000, and 2006; and raised as impeachment evidence a newly discovered statement written by the DPD regarding Herndon's initial communication to the police that only Watkins killed Ingram.  R. 34-48 (2017 Mot. at 1–3) (Page ID #9181–83).

[12]The Wayne County Prosecutor's office stipulated to several facts:  that "[t]he ground raised by [Watkins] that warrants granting him relief is that the evidence in this case included Detroit Police testimony regarding microscopic hair analysis which is undermined by new Federal Bureau of Investigation standards of hair comparison"; that the People's case "hinged" on Herndon's testimony and Badaczewski's "microscopic hair analysis/comparison testimony"; that "[a]ll evidence pertinent to this case has been destroyed" and "no pertinent evidence remains"; that Watkins's expert's proposed testimony and the "new . . . FBI standards for hair comparison are newly discovered evidence" that "Howenstine's proposed testimony and the new (2016) revised FBI standards for hair comparison . . . makes a different result probable on retrial"; and that "[i]nsufficient evidence exists to retry [Watkins]."  R. 34-49 (Stip. Order at 1–3) (Page ID #9236–38).

[13]Watkins's complaint further alleges:  "On October 30, 2017, Defendant, B[adaczewski], testified in another case involving Plaintiff's wrongful conviction that he never believed that forensic hair analysis was reliable enough to be used in a courtroom.  Instead, he believed that forensic hair analysis, like polygraph examinations, should be used only as an investigative tool.  He knew that a forensic hair examiner could never testify that one hair 'matched' another hair or that they were from the same source to a 'high degree of probability.'"  R. 30 (Am. Compl. at 26) (Page ID #7512).

[14]Watkins's amended complaint states:  "This is an action for damages brought pursuant to 42 U.S.C. §§1983 and *1998*, the 4th and 14th Amendments to the United States Constitution[.]"  R. 30 (Am. Compl. at 1–2) (Page ID #7487–88) (emphasis added).  We assume "1998" refers to 42 U.S.C. § 1988.  This error is inconsequential in this appeal because the sole issue that we address on review—absolute immunity—implicates only 42 U.S.C. § 1983.

Detroit.**16**  R. 1 (Compl. at 1–2) (Page ID #1–2).  In his amended complaint, Watkins brings the following claims against Healy:

- Count I:  fabrication of evidence in violation of the Fourth Amendment, R. 30 (Am. Compl. at 28) (Page ID #7514);

- Count II:  fabrication of evidence in violation of the Fourteenth Amendment, *id.* at 30 (Page ID #7516);

- Count III:  malicious prosecution in violation of the Fourth Amendment, *id.* at 31 (Page ID #7517);

- Count VIII:  civil conspiracy in violation of the Fourth Amendment, *id.* at 43 (Page ID #7529);

- Count IX:  civil conspiracy in violation of the Fourteenth Amendment, *id.* at 44 (Page ID #7530);

- Count XV:  common law malicious prosecution, *id.* at 56 (Page ID #7542).

His complaint also included a variety of state and federal claims against the other defendants.

In January 2019, Healy moved to dismiss Watkins's amended complaint pursuant to Rule 12(b)(6), R. 34 (Mot. Dismiss at 1) (Page ID #7734), which the district court denied, *Watkins v. Healy*, No. 17-CV-13940, 2019 WL 3777631, at \*1 (E.D. Mich. Aug. 12, 2019).  The district court also denied Healy's motion for reconsideration.  *Watkins v. Healy*, 429 F. Supp. 3d 420, 442 (E.D. Mich. 2019).  Healy timely filed a notice of appeal, bringing this case before this court.

## II.  DISCUSSION

### A.  Jurisdiction

Healy raises six issues on appeal:  (1) whether the applicable three-year statute of limitations bars Watkins's constitutional claims; (2) whether absolute immunity insulates Healy

---

**15**Schwartz died in 2010.  *See* Appellant's Br. at 3 n.6.

**16**On July 25, 2017, Watkins sued the State of Michigan in state court pursuant to Michigan's Wrongful Imprisonment Compensation Act.  The Michigan Court of Claims granted summary disposition to defendants, reasoning that Watkins's hair-analysis expert's affidavit "only articulates generic problems" with Badaczewski's analysis and trial testimony, but "fails to connect those problems to the testimony offered at [Watkins's] criminal trial in a way that undermines the specific conclusions reached in that case."  R. 41-4 (Mich. Ct. Cl. Order at 10) (Page ID #9917).  The Michigan Court of Appeals affirmed.  *See Watkins v. State*, No. 348855, 2020 WL 6236500, at \*1 (Mich. Ct. App. Oct. 22, 2020).

from Watkins's constitutional and common law claims; (3) whether the criminal proceedings terminated in favor of Watkins for his § 1983 claims; (4) whether the criminal proceedings terminated in favor of Watkins for his state-law claims; (5) whether Watkins has plausibly alleged a claim for civil conspiracy under § 1983; and (6) whether Watkins's § 1983 suit denies Healy due process. *See* Appellant's Br. at xi.

The parties have approached jurisdiction rather haphazardly. Neither Healy nor Watkins contested jurisdiction in their briefs.[17] After we pressed the issue at oral argument, Healy's counsel protested that this court does have appellate jurisdiction to consider all six of Healy's arguments. Watkins's counsel then expressed for the first time that this court has appellate jurisdiction over only the issue of absolute immunity (Issue #2). Healy's counsel replied that this court at least maintains appellate jurisdiction over both absolute immunity and the question of favorable termination (Issues #3 and #4). Healy subsequently submitted to this court a Federal Rule of Appellate Procedure 28(j) letter, in which he advanced for the first time that this court should exert pendent appellate jurisdiction to consider the statute-of-limitations issue (Issue #1). No. 20-1074, R. 44 (28(j) Letter at 2).

Notwithstanding the parties' scattered jurisdictional arguments, we must satisfy ourselves that we have appellate jurisdiction. *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 912 F.3d 316, 327 (6th Cir. 2018). Thus, we address whether we have appellate jurisdiction to review Healy's six issues per the collateral-order doctrine or via our pendent appellate jurisdiction.

Title 28 U.S.C. § 1291 grants appellate jurisdiction to the courts of appeals "only from 'final decisions' of the district courts," *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985), and a district court's order denying a Rule 12(b)(6) motion to dismiss is usually not a final decision

---

[17]In their briefs, Healy submits that we have jurisdiction pursuant to 28 U.S.C. § 1292(b), *see* Appellant's Br. at x, and Watkins argues that we have jurisdiction pursuant to 28 U.S.C. § 1291, *see* Appellee's Br. at 1. There is no record of the district judge certifying that his opinion "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]" 28 U.S.C. § 1292(b). Nor is there any record of the Sixth Circuit permitting any such appeal. *See id.* Thus, this court does not have jurisdiction under § 1292(b). Any appellate jurisdiction that we may have in this case is limited to § 1291 via the collateral-order doctrine or our pendent appellate jurisdiction, as explained *infra*.

that we may review under § 1291, *see Hart v. Hillsdale County*, 973 F.3d 627, 634–35 (6th Cir. 2020). A judicially created exception to this rule is the collateral-order doctrine, which originated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). In *Cohen*, the Supreme Court expressed that it had "long given" § 1291 a "practical rather than a technical construction." *Id.* at 546. The Court concluded that a district court decision is immediately appealable if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.*

One such collateral determination is a district court's denial of a defendant's motion for dismissal or summary judgment on the grounds of absolute immunity or qualified immunity "to the extent that it turns on an issue of law[.]" *Forsyth*, 472 U.S. at 525–30; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982). "[T]his exception is a narrow one. A denial of a claim of qualified immunity is immediately appealable only if the appeal is premised not on a factual dispute, but rather on neat 'abstract issues of law.'" *Hart*, 973 F.3d at 635 (quoting *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008)) (alteration in original). The prosecutorial-immunity issues here (Issue #2) implicate a "purely legal" question, *Forsyth*, 472 U.S. at 530, specifically whether the Court's prosecutorial-immunity jurisprudence applies retroactively to the events underlying Watkins's suit, *see* § II.B.3., *infra*. The collateral-order doctrine also allows us to consider whether Healy has satisfied his burden under Rule 12(b)(6) to show that absolute immunity is justified with respect to Watkins's claims. *See Prince v. Hicks*, 198 F.3d 607, 612 (6th Cir. 1999). Thus, we have appellate jurisdiction to review the district court's denial of absolute immunity for Healy's federal-law and state-law immunity arguments. *See Peterson v. Heymes*, 931 F.3d 546, 552–53 (6th Cir. 2019).[18]

---

[18]"We must look to state immunity law to determine if a denial of immunity based on state law is appealable." *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 691 (6th Cir. 2018) (alteration and citation omitted), *cert. denied*, 139 S. Ct. 1551 (2019). Specifically, we look to whether a state "has extended an underlying substantive right to the defendant official to be free from the burdens of litigation arising from acts taken in the course of his duties." *Id.* (citation omitted). When state law focuses only on granting officials immunity from liability, officials have no right to an interlocutory appeal. *See id.* But if a state seeks to guard officials from "'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties,

The collateral-order doctrine does not permit us, however, to consider Healy's five other issues. Healy did not raise his civil conspiracy and due-process arguments (Issues #5 and #6) to the district court; his forfeiture means that the district court issued no determination regarding these issues that could be considered collateral.[19] More importantly, we are not convinced that any of these five issues would satisfy the Supreme Court's three-prong collateral-order test. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (explaining that to be a qualifying collateral order, a district court decision must: (1) "conclusively determine the disputed question"; (2) "resolve an important issue completely separate from the merits of the action"; and (3) "be effectively unreviewable on appeal from a final judgment"). At bottom, the third prong is not met here because delaying review of these five issues until entry of final judgment does not "imperil a substantial public interest" or "some particular value of a high order." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107 (2009) (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)).

In his Rule 28(j) letter, Healy entreats us to exercise our pendent appellate jurisdiction to review the statute-of-limitations issue (Issue #1). We decline Healy's invitation. We maintain pendent appellate jurisdiction over otherwise nonappealable issues that are "inextricably intertwined" with appealable issues. *See Brennan v. Twp. of Northville*, 78 F.3d 1152, 1157 (6th Cir. 1996). This occurs when the nonappealable issue is "coterminous with, or subsumed in" the appealable issue, or, put another way, when "[o]ur finding on the first issue necessarily and unavoidably decides the second." *Id.* at 1158. Such jurisdiction is "discretionary" and "a refusal

---

inhibition of discretionary action, and deterrence of able people from public service,' we will conclude that the state intended to immunize its officials from suit and therefore intended to authorize interlocutory appeals from the denial of such immunity." *Id.* (quoting *Forsyth*, 472 U.S. at 526).

"Michigan courts have recognized a common-law prosecutorial immunity that closely tracks the absolute § 1983 immunity conferred by the Supreme Court in *Imbler*." *Cheolas v. City of Harper Woods*, No. 06-11885, 2009 WL 388548, at *9 (E.D. Mich. Feb. 13, 2009) (collecting cases); *see also Payton v. Wayne County*, 357 N.W.2d 700, 702–03 (Mich. Ct. App. 1984) (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)); *Davis v. Eddie*, 343 N.W.2d 11, 13 (Mich. Ct. App. 1983) (same). Thus, Michigan has adopted the Supreme Court's desire to immunize officials from litigation. *See Forsyth*, 472 U.S. at 526; *see also Davis*, 343 N.W.2d at 13 ("The public interest requires that persons occupying such important positions and so closely identified with the judicial departments of the government should speak and act freely and fearlessly in the discharge of their important official functions.") (quoting *Bloss v. Williams*, 166 N.W.2d 520, 523 (Mich. Ct. App. 1968)). Accordingly, we have jurisdiction to address whether Michigan's common-law prosecutorial immunity insulates Healy from Watkins's state-law malicious prosecution claim.

[19]We discuss forfeiture further in § II.C., *infra*.

[to extend the doctrine] could be based on particular circumstances in the case." *Id.*; *see also Williams v. Commonwealth of Kentucky*, 24 F.3d 1526, 1542 (6th Cir. 1994). Wary that Healy seeks "to parlay [a] *Cohen*-type collateral order[] into [a] multi-issue interlocutory appeal ticket[,]" we invoke our discretion and decline to exercise our pendent appellate jurisdiction over any of his five other issues. *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 49–50 (1995).

Healy's letter correctly points out that the D.C. Circuit has held and the Tenth Circuit has suggested that pendent appellate jurisdiction permits review of an otherwise unappealable statute-of-limitations defense in other contexts. *See Rendall-Speranza v. Nassim*, 107 F.3d 913, 917 (D.C. Cir. 1997); *Wilkins v. DeReyes*, 528 F.3d 790, 796 (10th Cir. 2008). Because the courts of appeals have set their own standards for when pendent appellate jurisdiction is appropriate, other circuits' decisions are less persuasive here than they are in other contexts.[20] We, and only we, decide whether to grant pendent appellate jurisdiction. Because the statute of limitations issue is not "inextricably intertwined" with the appealable immunity issues, we decline to exercise pendent appellate jurisdiction over the limitations issue.

Accordingly, we consider only one of Healy's issues—whether his alleged actions are shielded by absolute immunity.

---

[20]The circuits that invoke pendent appellate jurisdiction diverge as to the breadth of this kind of jurisdiction. For example, the D.C. Circuit exercises appellate jurisdiction "only when 'substantial considerations of fairness or efficiency demand it.'" *Rendall-Speranza*, 107 F.3d at 917 (quoting *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir.1996)). When deciding whether this standard has been met, the D.C. Circuit considers several factors, only one of which is whether the issues are "inextricably intertwined." Because we home in on the "inextricably intertwined" analysis, it is not at all given that we—or other circuits that follow their own standards—would reach the same conclusion as the D.C. Circuit. Indeed, the Fourth Circuit, Fifth Circuit, and the Tenth Circuit (in a case with similar facts to Watkins's suit) have declined to exercise pendent appellate jurisdiction over a statute-of-limitations defense when they had appellate jurisdiction over a denial of immunity. *See Johnson v. Johnson*, 694 F. App'x 945, 947 (5th Cir. 2017); *Sanchez v. Hartley*, 810 F.3d 750, 761 (10th Cir. 2016); *Ochoa Lizarbe v. Rivera Rondon*, 402 F. App'x 834, 837 (4th Cir. 2010).

In short, because the circuits differ as to whether pendent appellate jurisdiction should be invoked at all, what the scope of such jurisdiction is, and when it is appropriate to review pendent issues, we follow our own precedent in deciding whether to exercise our discretionary pendent appellate jurisdiction.

**B. Absolute Immunity**

Healy argues that he is entitled to absolute immunity regarding Watkins's constitutional and common-law claims. *See* Appellant's Br. at 39. Taking Watkins's plausible allegations in his amended complaint as true, we conclude that Healy is not entitled to absolute immunity.

**1. Standard of Review**

We review de novo a district court's denial of a Rule 12(b)(6) motion to dismiss based on absolute immunity. *Koubriti v. Convertino*, 593 F.3d 459, 466 (6th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Federal courts must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and draw all reasonable inferences in [the plaintiff's] favor." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020). "As a general rule, a court considering a motion to dismiss 'must focus only on the allegations in the pleadings.'" *Id.* (quoting *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020)).

**2. Advocacy Versus Investigation**

Because "Michigan courts have recognized a common-law prosecutorial immunity that closely tracks the absolute § 1983 immunity conferred by the Supreme Court[,]" we turn to the Supreme Court to resolve whether Healy is entitled to absolute immunity for both Watkins's federal-law and state-law claims. *See Cheolas v. City of Harper Woods*, No. 06-11885, 2009 WL 388548, at *9 (E.D. Mich. Feb. 13, 2009) (collecting cases). In *Imbler v. Pachtman*, 424 U.S. 409 (1976), the Court held that prosecutors enjoy absolute immunity from § 1983 suits for damages when they act "within the scope of [their] duties in initiating and pursuing a criminal prosecution[,]" *id.* at 410. The Court acknowledged that "initiating a prosecution and [] presenting the State's case" are "intimately associated with the judicial phase of the criminal

process[,]" but declined to reach the question of whether absolute immunity is accorded to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* 430–31; *see also Burns v. Reed*, 500 U.S. 478, 491 (1991) (explaining that *Imbler* "reserved judgment" regarding whether prosecutors were entitled to absolute immunity in their "role as 'administrator or investigative officer[]'").

In the decades following *Imbler*, the Court "revisited and refined" its prosecutorial immunity jurisprudence. *Rouse v. Stacy*, 478 F. App'x 945, 947 (6th Cir. 2012); *see, e.g.*, *Burns*, 500 U.S. at 486, 495 (acknowledging "the functional approach to immunity employed in *Imbler*" and "inquir[ing as to] whether the prosecutor's actions are closely associated with the judicial process[]"). One such instance is *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), where the Court clarified that the key to an absolute immunity inquiry is "the nature of the function performed, not the identity of the actor who performed it[,]" *id.* at 269 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). In *Buckley*, the Court addressed the question that it had declined to reach in *Imbler*. The Court reiterated that acts undertaken by a prosecutor "in his role as advocate for the State"—involving "actions preliminary to the initiation of a prosecution and actions apart from the courtroom"—are accorded absolute immunity. *Buckley*, 509 U.S. at 272 (quoting *Imbler*, 424 U.S. at 431 n.33). "[But] when a prosecutor 'functions as an administrator rather than as an officer of the court' he is entitled only to qualified immunity." *Id.* at 273 (quoting *Imbler*, 424 U.S. at 431 n.33).

Decades of clarification have produced sundry examples of prosecutorial actions that fall on both sides of the advocacy-investigation border. Prosecutors function as advocates—and are thus protected by absolute immunity—when "knowingly us[ing] false testimony and suppress[ing] material evidence[,]" *Imbler*, 424 U.S. at 413; "evaluating evidence and interviewing witnesses as he prepares for trial," *Buckley*, 509 U.S. at 273; "participat[ing] in a probable cause hearing," *Burns*, 500 U.S. at 487; "prepar[ing] and filing . . . the information and the motion for an arrest warrant[,]" *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997); or "making statements at a preliminary examination about the availability of a witness," *Adams v. Hanson*, 656 F.3d 397, 399 (6th Cir. 2011). Prosecutors act as investigators and are entitled at most to only qualified immunity when giving "legal advice to the police[,]" *Burns*, 500 U.S. at 487, 496,

including "g[iving] legal advice prior to the existence of probable cause and prior to [the prosecutor's] determination that she would initiate criminal proceedings against [a defendant,]" *Prince*, 198 F.3d at 614–15; "fabricat[ing] [] false evidence" before "a special grand jury was empaneled[,]" *Buckley*, 509 U.S. at 275; and "directing the [police's] investigation, advising the [police] regarding the legality of the [products seized from defendants], and propelling the officers to execute [an operation to seize products]" "prior to the initiation of judicial proceedings and without probable cause[,]" *Rieves v. Town of Smyrna*, 959 F.3d 678, 692 (6th Cir. 2020). The Court has "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question[,]" *Burns*, 500 U.S. at 486, and is "quite sparing" in granting absolute immunity, *Buckley,* 509 U.S. at 269 (quoting *Forrester*, 484 U.S. at 224).

Watkins alleges that Healy committed four acts inside, or right outside, Herndon's interrogation room, all of which could implicate the doctrine of absolute immunity. First, Healy allegedly threatened to charge Herndon with two murders, even though Herndon had told Healy that Watkins was not involved in Ingram's murder. R. 30 (Am. Compl. at 28) (Page ID #7514). Second, Healy apparently promised Herndon immunity for testifying at Watkins's trial, notwithstanding Herndon's statements regarding Watkins's lack of involvement in the Ingram murder. *Id.* Third, Healy purportedly "assist[ed] with the interrogation of Herndon." *Id.* at 29 (Page ID #7515).[21] Fourth, Healy supposedly conspired with Schwartz to "intimidat[e] and coerc[e] Travis Herndon into falsely implicating Watkins." *Id.* at 43–44 (Page ID #7529–30).

Absolute immunity protects none of these four acts. Healy purportedly questioned and threatened a witness during an interrogation that took place in the midst of the investigation into Ingram's murder. All four of Healy's alleged actions occurred before any probable cause hearing, *see Buckley*, 509 U.S. at 275; *cf. Burns*, 500 U.S. at 487; before any arrest warrant was

---

[21]In Count III, Watkins alleges that Healy "influenced or participated in the initiation of criminal prosecution when he deliberately and knowingly fabricated evidence by manufacturing Travis Herndon's false 'fourth version' of the murder, which was material to a finding of probable cause." R. 30 (Am. Compl. at 32) (Page ID #7518). The portion of the sentence about the initiation of criminal prosecution could be interpreted as Watkins' alleging that Healy improperly prosecuted him, which could be protected by *Imbler* as a function of advocacy. But the latter half of the sentence and the rest of Count III focus on the purported knowing fabrication of evidence during interrogation, which is clearly an investigative function.

sought, *cf. Kalina*, 522 U.S. at 129; or before a grand jury was convened, *see Buckley*, 509 U.S. at 275. By interrogating Herndon—and allegedly threatening Herndon during said interrogation—Healy was not performing "the advocate's role [of] evaluating evidence and interviewing witnesses as he prepares for *trial*"; he was performing "the detective's role in searching for the clues and corroboration that *might give him probable cause* to recommend that a suspect be arrested." *Buckley*, 509 U.S. at 273 (emphases added).**22** Healy's four actions were completely divorced from "the judicial phase of the criminal process." *See Imbler*, 424 U.S. at 430. In short, "[p]rosecutors who supervise and participate in unconstitutional police interrogations of a criminal suspect are not entitled to absolute immunity." *Wendrow v. Mich. Dep't of Human Servs.*, 534 F. App'x 516, 527 (6th Cir. 2013); *see also Fields v. Wharrie*, 740 F.3d 1107, 1113 (7th Cir. 2014) (refusing to "bless [the] breathtaking injustice" of a "[p]rosecutor, acting pre-prosecution as an investigator, [who] fabricates evidence and introduces the fabricated evidence at trial").**23**

---

**22**Watkins points out that Healy was deposed in Watkins's lawsuit against the State of Michigan, which is currently making its way through state court. Watkins highlights the transcript of the relevant part of Healy's deposition, in which Healy admits that the purpose of an investigative interview—such as the interview of Herndon—"is to get information from a prisoner." Appellee's Br. at 37. This statement of Healy could be interpreted as Healy's conceding that his interrogating Herndon was the performance of investigative functions. Of course, for a Rule 12(b)(6) appeal, this court is limited to the facts stated in the complaint. But this admission indicates that Watkins has met his burden under *Iqbal* and *Twombly* of plausibly alleging that Healy was acting in his investigative role.

**23**Healy cites several cases about prosecutorial immunity that are readily distinguishable.

The case that most supports Healy's position is our unpublished case, *Beckett v. Ford*, 384 F. App'x 435 (6th Cir. 2010). In *Beckett*, we determined that a prosecutor who "pressured, threatened, and enticed witnesses to lie at Beckett's trial" was performing advocacy functions and was entitled to absolute immunity. *Id.* at 451. But Beckett's and Watkins's complaints are noticeably dissimilar. "[D]espite pointing to the fact that [the prosecutor] did some investigating, *Beckett does not allege that [the prosecutor] engaged in any wrongdoing* as part *of that investigating*. Instead, Beckett argues that [the prosecutor] acted improperly while *preparing [the witness] to testify*." *Id.* at 441 n.3 (emphases added). Beckett's complaint alleged that the prosecutor threatened the witness when "he reviewed with [the witness] what [the witness] would *say on the stand*." *Id.* at 451 (emphasis added). Here, Watkins does not allege that Healy was *preparing* Herndon's testimony for trial in the immediate lead-up to trial; Watkins alleges that Healy pressured Herndon to testify to secure an unconstitutional conviction before any probable cause existed, any warrant was sought, and any grand jury was convened. Further, Watkins plausibly alleges that Healy threatened Herndon during an interrogation in order to falsify a taped statement that would serve as the sole basis for an arrest warrant; this falls squarely into the investigative stage of this case.

For the same reasons, this case is also distinguishable from *Spurlock v. Thompson*, 330 F.3d 791 (6th Cir. 2003). In *Spurlock*, we granted absolute immunity to a prosecutor who allegedly had two witnesses testify falsely at a defendant's second criminal trial. *See id.* at 795. But in *Spurlock*, the supposed coercion took place long after the investigative stage, because probable cause had been established and an entire first trial had already transpired. *See*

Healy argues that a prosecutor ceases to be an investigator and starts acting like an advocate when the "prosecutor speak[s] with an accomplice/witness <u>after</u> that individual had already implicated someone in a murder to a detective." Appellant's Br. at 46. Here, contends Healy, Herndon had already implicated Watkins before Healy and Schwartz apparently threatened Herndon. *Id.* But erecting Healy's suggested barrier between investigation and advocacy would impermissibly contradict the Supreme Court. In *Buckley*, the Court concluded that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. "Of course," the Court continued, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5.

In other words, the *Buckley* Court made clear that a prosecutor acts only as an investigator and not an advocate *before* probable cause surfaces and may act as either investigator or advocate *after* probable cause arises. Because an individual who implicates someone in a murder does not necessarily generate probable cause, Healy's suggested bright-line rule would radically dislocate the Court's thoughtful consideration of when investigation may cease and advocacy might begin. Instead, a straightforward application of *Buckley* is merited. Here, Watkins plausibly alleges that Herndon's taped statement, which Healy allegedly helped procure, was the sole basis for Schwartz's application for an arrest warrant. Thus, Watkins alleges that Healy was functioning as an investigator, and not as an advocate.

Even if Herndon's two initial statements—which implicated Watkins—generated probable cause before Schwartz tape-recorded Herndon, *Buckley* dictates that this would not automatically transform Healy from investigator to advocate. *Wendrow v. Michigan Department of Human Services* is illustrative. In *Wendrow*, we denied absolute immunity to two prosecutors who interviewed a suspect before the suspect's parent was arrested. 534 F. App'x at 527. Even

---

*id.* The events in *Spurlock* occurred in the heart of a period where the prosecutor was acting solely as an advocate, not an investigator. Further, as in *Beckett*, the *Spurlock* prosecutor supposedly pressured the witnesses in the process of preparing the witnesses' statements at the second trial. *See id.* Again, Healy's alleged coercion of Herndon took place in the context of interrogation—a purely investigative function—and Healy supposedly acted to create the sole basis of probable cause; thus, probable cause did not yet exist.

though the interview "took place after probable cause to arrest [the parent] was established and in preparation for court proceedings[,]" we rejected the prosecutors' position "that they were merely interviewing witnesses as part of their preparation for trial" and that "gathering new information does not transform their function into that of investigation." *Id.* Consistent with *Buckley*, we once again reject any bright-line rules that would suggest that a prosecutor automatically passes from the realm of investigation to the world of advocacy as soon as a witness implicates someone or when probable cause arises.[24]

### 3. Retroactivity

Healy falls back on an equity-laden retroactivity argument. He urges that we apply only *Imbler*, a 1976 decision, and not *Buckley*, a 1993 decision. *See* Appellant's Br. at 43. Healy protests that "Healy's actions in connection with the prosecution of Watkins in 1975 and 1976 were protected by immunity at the time he performed his duties" and that "[i]t is unfair to evaluate his actions in light of precedent established 17–18 years after he took them." *Id.* According to Healy, "the standards of prosecutorial immunity in effect in 1975–76 should apply and would have immunized him from Watkins'[s] § 1983 claims." *Id.* at 39.

Healy's backward-looking approach flies in the face of the Supreme Court's retroactivity rule for civil cases. In *Harper v. Virginia Department of Taxation*, 509 U.S. 86 (1993), the Supreme Court addressed the "precise extent to which the presumptively retroactive effect of this Court's decisions may be altered in civil cases." *Id.* at 96. Citing its earlier plurality decision in *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991), the Court held that:

> When this Court applies a rule of federal law to the parties before it, that rule is
> the controlling interpretation of federal law and must be given full retroactive

---

[24]None of the cases that Healy cites support his suggested demarcation. In *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997), we explained only that "[a] prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer fall squarely within the aegis of absolute prosecutorial immunity[,]" *id.* at 1446. *Ireland* did not speak to whether investigatory functions ceased when a witness implicated someone. So too does Healy embellish the implications of *Red Zone 12 LLC v. City of Columbus*, 758 F. App'x 508 (6th Cir. 2019). In *Red Zone*, the allegations about the prosecutor's "conduct all center around his initiation and prosecution of the . . . suit." *Id.* at 514. Any boundary that could be gleaned from *Ireland* or *Red Zone* relates to the prosecutor's decision to initiate a suit and not the moment that a witness implicates a suspect or when probable cause emerges.

effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Harper*, 509 U.S. at 97–98.

Applying *Beam* and *Harper* to *Buckley* is straightforward. Absolute immunity is a federal rule, *see Buckley*, 509 U.S. at 270 (describing the "rule of absolute immunity"), that the Court has applied to the parties before it without reservation, *see, e.g.*, *id.* at 275. Thus, *Buckley* and its progeny apply with full retroactive force to the events underlying Watkins's claims. Our understanding of *Harper* is confirmed by Supreme Court and courts of appeals decisions that apply *Buckley* to events that long predated the filing of a § 1983 suit. *See, e.g.*, *Kalina*, 522 U.S. at 120, 126 (applying *Buckley* even though underlying events occurred in 1992); *Collyer v. Darling*, 98 F.3d 211, 216, 221 (6th Cir. 1996) (citing *Buckley* even though underlying events took place between 1982–1985 and suit was filed in 1992); *Giuffre v. Bissell*, 31 F.3d 1241, 1244, 1254 (3d Cir. 1994) (applying *Buckley* even though underlying events took place in 1991 and § 1983 suit was filed in 1992); *Fields*, 740 F.3d at 1110–11 (applying *Buckley* even though underlying events occurred in 1985); *see also Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 752 (1995) (describing *Harper*'s holding as "when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive,' applying it, for example, to all pending cases, *whether or not those cases involve predecision events*") (emphasis added).

By beseeching us to consider whether it is "fair" to hold him to modern standards of prosecutorial immunity, Healy asks us to flout the Court's "ban against selective application of new rules." *Harper*, 509 U.S. at 97 (internal quotation marks omitted). We have "no more constitutional authority in civil cases than in criminal cases to disregard current law," and "[i]n both civil and criminal cases, we can scarcely permit the substantive law to shift and spring according to the particular equities of individual parties' claims of actual reliance on an old rule and of harm from a retroactive application of the new rule." *Id.* (alterations and internal quotation marks omitted); *see also Pollard v. State Farm Fire & Cas. Nat'l Union Fire Ins. Co.*, 122 F. App'x 837, 842 (6th Cir. 2005) (rejecting argument that litigants' reliance interests on old

precedent should prevent court from applying new Supreme Court decision retroactively pursuant to *Harper*).

Even if we were to consider Healy's equitable contentions, "the standards of prosecutorial immunity in effect in 1975–76" in no way aid Healy's appeal. Appellant's Br. at 39. The law that existed in the Sixth Circuit during this period was identical to *Buckley*. In *Imbler*, the Court acknowledged that several courts of appeals had "h[e]ld that a prosecutor engaged in certain investigative activities enjoys, not the absolute immunity associated with the judicial process, but only a good-faith defense comparable to the policeman's." *Imbler*, 424 U.S. at 430 & n.31 (collecting cases). The Court concluded that it "ha[d] no occasion to consider" these courts of appeals' decisions. *Id.* at 430. Relevant here is our decision *Hilliard v. Williams*, 465 F.2d 1212 (6th Cir. 1972) [hereinafter *Hilliard I*], which Justice White examined in his *Imbler* concurrence, *Imbler*, 424 U.S. at 443 (White, J., concurring). The *Hilliard I* court held that a prosecutor's "deliberate suppression" of exculpatory evidence was "beyond the scope of duties constituting an integral part of the judicial process." *Hilliard I*, 465 F.2d at 1218 (internal quotation marks omitted). This is essentially *Buckley*'s holding. Thus, even without *Buckley*, Healy's actions would not benefit from absolute immunity in light of *Hilliard I*.

Healy correctly points out that we later vacated *Hilliard I* in light of *Imbler* in *Hilliard v. Williams*, 540 F.2d 220 (6th Cir. 1976) (per curiam) [hereinafter *Hilliard II*]. But Healy cannot overcome his own logic. *Hilliard I* was decided on July 31, 1972; Healy allegedly fabricated or conspired to fabricate evidence in October 1975; *Imbler* was decided on March 2, 1976; Watkins was convicted on March 16, 1976; and *Hilliard II* was issued on August 2, 1976. In October 1975—when Healy supposedly fabricated evidence—the law was plainly *Hilliard I*. On March 16, 1976, the law was still *Hilliard I* because *Imbler* specified that the Court was not overruling courts of appeals' decisions, like *Hilliard I*, that refused to accord absolute immunity to prosecutors performing functions outside the scope of advocacy. *Imbler*, 424 U.S. at 430. Because *Hilliard I* was the law in the Sixth Circuit from July 31, 1972 to August 16, 1976, Healy's argument defeats itself.

**C. Qualified Immunity**

Pursuant to the *Imbler* and *Buckley* line of cases, Healy is at most entitled to qualified immunity for his alleged actions. But Healy failed to raise a qualified-immunity argument to the district court or in his brief before us; he has thus forfeited the issue at this stage of the case.

In his Rule 12(b)(6) motion, Healy cursorily references qualified immunity under a section titled "Absolute Immunity Bars the Fourth Amendment Claims[.]" R. 34 (Mot. Dismiss at 24–25) (Page ID #7763–64). Under this heading, Healy supplies one paragraph that describes the qualified immunity two-prong test without any application to the present case. Another section header reads "Absolute and/or Qualified Immunity Bars the Due Process Claim[,]" but the sole paragraph that follows pertains only to absolute immunity. *Id.* at 35–36 (Page ID #7774–75). The district court found:

> Healy cites boilerplate law related to the doctrine of *qualified* immunity. But the arguments that Healy makes under this section of his motion relate solely to *absolute* immunity, not qualified immunity. Healy has not developed any argument in his pending motion to dismiss that he is entitled to qualified immunity, and he has not provided the Court any basis to conclude that he is entitled to qualified immunity. To the extent that Healy believes that he may be entitled to qualified immunity, he may raise that argument on summary judgment.

*Watkins*, 2019 WL 3777631, at *9 n.8. In a footnote in his motion for reconsideration, Healy mentioned qualified immunity just one time: "The reason why APA Healy framed this in the amended motion to dismiss as 'absolute and/or qualified immunity' is because it is not clear how the two doctrines interact when there is an argument that an individual would not have been on notice whether absolute immunity would apply to particular conduct." R. 49 (Mot. Reconsider at 12 n.5) (Page ID #10098). Based on this footnote, the district court—in its opinion denying reconsideration—found that Healy "appears to contend, in other words, that he is entitled to qualified immunity[.]" *Watkins*, 429 F. Supp. 3d at 440. The court still rejected qualified immunity as a basis to dismiss Watkins's suit. *Id.* 440–41.

On appeal, Healy's brief includes sparse references to the policies behind qualified immunity in a section titled "Applying Later Standards of Prosecutorial Immunity Is Unfair To a Prosecutor Who Would Have Relied on Its Protections in Performing His or Her Duties[,]" in

which Healy argues that "nothing in *Imbler* or in any binding precedent in this Circuit would have put APA Healy on notice that he was 'abandoning' his role as a 'prosecutor' by speaking with the primary witness/accomplice who had already implicated a suspect (twice) in a contemplated murder prosecution." Appellant's Br. at 43–45. Nowhere in this section, or elsewhere in his brief, does Healy articulate the qualified-immunity rules or otherwise argue that qualified immunity applies to his actions in 1975 and 1976. At most, Healy references the "purpose of qualified immunity" to support his "fairness" argument. *Id.* at 44. In his brief, Healy does not dispute the district court's finding that qualified immunity does not bar Watkins's suit.

By failing properly to assert qualified immunity in his Rule 12(b)(6) motion to dismiss, Healy has forfeited this issue.[25] *See 600 Marshall Ent. Concepts, LLC v. City of Memphis*, 705 F.3d 576, 585 (6th Cir. 2013) ("[T]he failure to present an issue to the district court forfeits the right to have the argument addressed on appeal.") (citation omitted); *United States v. White*, 920 F.3d 1109, 1122–23 n.4 (6th Cir. 2019) (Clay, J., concurring in part) ("[A] defendant *forfeits* an argument by, for instance, failing to make it before the district court, failing to make it in its opening appellate brief, or identifying it without pressing it." (citations omitted)), *cert. denied*, 140 S. Ct. 2667 (2020). Healy's mentioning qualified immunity in a footnote in his motion to reconsider is insufficient. *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007). Even if we were to disregard the district court's finding that Healy's Rule 12(b)(6) motion failed to raise a qualified-immunity argument, Healy forfeited the issue on appeal via his perfunctory mentions of qualified immunity in his brief. *See Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005); *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007).[26]

---

[25]Some of our precedents interchange the terms "waiver" and "forfeiture." Although related, the concepts are distinct. "Waiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right." *Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019) (alterations and internal quotation marks omitted). Because Healy failed to raise a qualified-immunity argument to the district court and, at most, identified without pressing the issue in his brief, forfeiture is the correct term here. *See id.*

[26]At oral argument, we asked Healy's counsel whether Healy had forfeited the issue of qualified immunity. Healy's counsel submitted that Healy had sufficiently addressed the issue of qualified immunity in his favorable-termination arguments. We disagree. In his motion to dismiss, Healy submits "[i]n the [a]lternative" that "to

The rule that we "would typically consider" an issue omitted from a brief to be waived or forfeited is "not jurisdictional, and [we] may choose to entertain arguments not raised by the parties when the failure to do so would constitute a miscarriage of justice." *Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999). But no miscarriage of justice would occur by applying forfeiture principles and declining to reach the question of qualified immunity given the current posture of this case:

> [I]t is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12. It is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds because development of the factual record is frequently necessary to decide whether the official's actions violated clearly established law.

*Hart*, 973 F.3d at 635 (citations, alterations, and quotation marks omitted). In sum, Healy has forfeited the issue of qualified immunity at this stage of the proceedings. Should Healy raise qualified immunity in a motion for summary judgment, as the district court suggests, that would be the more appropriate time for this court to address that issue.

### III. CONCLUSION

In sum, Healy is not entitled to absolute immunity for Watkins's claims of constitutional and common law malicious prosecution and falsification of evidence, and Healy has forfeited the issue of qualified immunity at this stage of the litigation. We affirm the denial of absolute immunity to Healy and remand for further proceedings consistent with this opinion.

---

establish a malicious prosecution claim under § 1983, a plaintiff must show that the proceedings 'terminated in his favor.'" R. 34 (Mot. Dismiss at 34) (Page ID #7773). There is no mention of qualified immunity. Healy's brief states that "[f]or each of his federal claims, Watkins has the burden under § 1983 to demonstrate that the criminal proceedings 'terminated in his favor' to establish a Constitutional violation to overcome any qualified immunity that would attach." Appellant's Br. at 49. Besides putting the words "qualified immunity" in this sentence, Healy does not otherwise contend that he is entitled to qualified immunity in his favorable-termination arguments or in any other part of his brief. For the same reasons that we articulate *supra*, this bare mention of "qualified immunity" constitutes forfeiture.